## DEPAS *v.* RIEZ, Executrix.

Testamentary dispositions, made by a husband in favor of his wife, when he leaves a child at the time of his death, are governed by art. 1739 of the Civil Code. Art. 1480 does not apply to donations between married persons. Art. 1739 embraces testamentary dispositions, as well as donations *inter vivos.*

Definitions incorporated in a Code must be construed with reference to its positive enactments *in pari materiâ,* and have no meaning beyond them.

Art. 1745 of the Civil Code applies to testamentary dispositions.

The provision of art. 1745 of the Civil Code, which authorizes one who contracts a second or subsequent marriage, having a child by a former one, to give to the other spouse only the least child's portion, and that only as an usufruct, and which declares that the portion, of which the donee is to have the usufruct, shall in no case exceed the fifth part of the donor's estate, extends to all the property of which the donor may die possessed, whether brought by him into marriage or subsequently acquired.

The provision of art. 552 of the Civil Code, which authorizes one by whom an usufruct has been established, to dispense, in favor of the usufructuary, with the securety required by that and the preceding article, must be construed with reference to art. 1485, which prohibits testators from disposing of the legitimate portion to the prejudice of their descendants. One who has the usufruct of property forming part of the legitimate portion of the descendants of the person by whom the usufruct was established, cannot be relieved from giving security.

Compensation is due to the community, for the value of useful improvements made during its existence, by the common labor or expense of the spouses, upon the separate property of either. But as such improvements benefit the community by increasing the value and income of the property, which it enjoyed to the day of its dissolution, and are of advantage to the heirs of the owner only from that period, the compensation to which the community is entitled is the value of the improvements at the time of the dissolution, and not at the time when they were made ; but whatever may be their value at that time, the recompense due to the community can never exceed their cost.

Any legal evidence is admissible to rebut the presumption that, a balance due on the price of

property purchased by the husband before marriage, but subsequently paid for by him, was paid out of the funds of the community.

The community is entitled to the enjoyment of all the property and effects belonging to the husband at the time of the marriage (C. C. 2371) ; and it owes no recompense to the succession of the latter, for any diminution in their value resulting from such enjoyment.

Property brought by the husband into marriage will belong to his succession, in the condition in which it was at the dissolution of the marriage ; but it cannot claim credit for the value of the property at the date of the marriage.

The debts of the community must be paid out of its assets, and the surviving wife is entitled only to one-half of what will remain after their payment.

Where an executrix has paid debts due by the succession, though without authority, she will be entitled to credit for the amounts so paid.

An executrix who fails to deposit in bank the money of a succession, as required by sec. 3 of the stat. of 13 March, 1837, must be dismissed from office, on proof thereof, made in the manner prescribed by that section.

A PPEAL from the Second District Court of New Orleans, *Canon*, J. *Phinias Depas* by his will bequeathed to the defendant, his widow, all that the law permitted him to dispose of in her favor, in full property, or usufruct, at her choice, dispensing her from furnishing security in case she decides to take the usufruct. He left one son by a former marriage. His will was ordered to be executed, on the petition of his widow, who qualified as executrix. An action of partition instituted by the plaintiff, the only son and heir of the testator, against the defendant, having been consolidated with an opposition made by the plaintiff to the account of her administration, there was a judgment below decreeing the defendant to be entitled to one-fifth only of the property in usufruct, and setting aside the account, and ordering her to file another. A rule taken on the executrix to show cause why she should not be dismissed from office, for having failed to deposit in bank the funds of the succession, in conformity to the stat. of 13 March, 1837, was, on the same day, made absolute, and a judgment rendered dismissing her from office. The defendant appealed from both of these judgments.

*L. Castera*, for the plaintiff. I. *Le legs fait à Nanette Riez, est-il réductible? et qu'elle doit en être la quotité ?*

D'après Depas, elle a droit au cinquième en usufruit seulement, ainsi que l'a décidé le jugement; elle prétend, au contraire, avoir droit au deux tiers, tant du propre, que de la communauté, sans préjudice de l'autre moitié lui revenant dans ladite communauté. Cette prétention ne saurait être maintenue. Il suffit à cet égard de consulter les articles 1840, 1739 et 1745 du Code qui nous régit.

Le premier de ces articles dit : " Les donations soit entre-vifs, soit pour cause de mort, ne pourront excéder les deux tiers des biens du disposant, s'il laisse à son décès un enfant légitime ; la moitié, s'il laisse deux enfants; le tiers, s'il en laisse trois ou un plus grand nombre.

" Sous le nom d'enfants, sont compris les descendants, en quelque degré que ce soit, bien entendu qu'ils ne sont comptés que pour l'enfant qu'ils représentent."

L'article 1739 dispose ainsi : "L'époux peut, soit par contrat de mariage, soit pendant le mariage, pour le cas *où il ne laisserait point d'enfants ni de descendants légitimes*, donner à l'autre époux, en toute propriété, tout ce qu'il pourrait donner à un étranger.

" Et pour le cas où l'époux donateur laisse des *enfants* ou *descendants légitimes*, il peut donner à l'autre époux, ou un dixième en propriété, *ou le cinquième de tous ses biens en usufruit seulement.*"

Enfin, d'après l'article 1745 : " L'homme ou la femme qui contractera un second, ou un subséquent mariage, *ayant des enfants d'un autre lit, ne pourra* donner à son nouvel époux qu'une part d'enfant le moins prenant, et en *usufruit seulement*, sans que, dans *aucun cas*, la portion dont le donataire aura l'usufruit puisse excéder le *cinquième des biens du donateur.*"

La première réflexion qui se présente sur ces trois dispositions c'est, qu'elles n'établissent aucune distinction entre les dispositions *soit entre-vifs, soit pour cause de mort.* La loi française étant la même que la nôtre sur cette matière, qu'on me permette de citer, non pas la jurisprudence, qui est unanime sur ce point, mais l'opinion émise par un des commentateurs les plus distingués du Code Napoléon, sur ce point.

Duranton, vol. 8, page 303, no. 282, s'exprime ainsi : " La portion disponible, comme on vient de le dire, varie en raison du nombre et de la qualité des personnes à qui la réserve est due ; nous l'envisagerons sous tous les rapports.

" *La loi ne fait au surplus aucune distinction quant à la fixation de cette portion entre les dispositions entre-vifs, et les dispositions testamentaires* (art. 913 du Code Napoléon, 1480 de notre Code) ; *et c'est avec raison, car la réserve devait toujours être intacte.*" Code Civile de la Louis., arts. 1480, 1481,1486, 1488, 1489, 1491, 1492.

Ce principe posé, il est facile d'établir que les trois articles cités peuvent facilement recevoir, chacun d'eux, leur application, et qu'il n'existe entre eux aucune espèce d'antinomie ou conflit. En effet, d'après l'art. 1480, si le défunt laisse à son décès un enfant légitime, la quotité disponible est des *deux tiers* de ses biens ; tel est, dans ce cas, le disponible ordinaire, le privilége du disposant. La loi, sans vouloir violer ce privilége, a voulu sagement empêcher certaines personnes, et notoirement le conjoint survivant, de recevoir cette quotité disponible. *Specialia generalibus derogant, ff De regulis juris.* Suivant l'article 1739, l'époux donateur ou testateur, s'il laisse des enfants, peut disposer *d'un dixième,* en toute propriété, ou d'un cinquième en usufruit, en faveur de l'autre époux ; c'est là une quotité disponible, relative à l'époux survivant qui *a des enfants de ce mariage.* On voit donc qu'il n'existe aucun conflit entre ces deux articles : car dans le premier, le législateur trace une règle générale qui se trouve modifiée par les dispositions de l'article subséquent ; cette démonstration va devenir complète par l'examen du dernier des trois articles. Selon l'art. 1745, l'époux qui aura des enfants d'un autre lit, ne pourra donner à son *nouvel époux* qu'une part d'enfant le moins prenant, et en usufruit seulement, sans que, *dans aucun cas,* la portion dont le donataire aura l'usufruit puisse *exceder le cinquième des biens du donateur.*

Qui ne voit que cette disposition, loin d'être en opposition avec l'art. 1480, ne se trouve en harmonie parfaite avec lui ; en effet, le testateur peut disposer des deux tiers de ses biens en faveur d'un étranger dans le cas prévu par ce dernier article, et ce droit se trouve restreint par l'art. 1739, ainsi que par l'art. 1745, qui sont une exception établie par le législateur, en ce qui regarde le *conjoint survivant, et pour ne pas permettre la spoliation des enfants d'un premier mariage.*

En résumé, il existe dans notre Code trois quotités disponibles, dans le cas où le donateur ou testateur laisse des enfants. La première est celle qu'on peut appeler quotité disponible ordinaire, prévue par l'art. 1480. La seconde, relative à l'époux donataire ou légataire, qui a des enfants de son mariage avec l'époux décédé, quotité prévue par l'article 1739, et qui constitue une réserve légale au profit des enfants du même lit. La troisième, relative à l'époux donataire ou légataire, dans le cas où l'époux donateur ou testateur a des enfants d'un précédent mariage, quotité prévue par l'art. 1745.

On voit donc maintenant qu'il n'y a aucune antinomie entre ces divers textes de la loi. N'est-il pas vrai en effet que l'époux donateur ou testateur peut toujours donner ou léguer même, quand il y a un enfant, les *deux tiers* de ses biens, pourvu que le légataire institué ou le donataire *ne soit pas le conjoint survivant ?* Sans le moindre doute, il peut le faire, il en a le droit, seulement ce droit est modifié et restreint par les dispositions subséquentes.

Ainsi, lorsqu'il y a des enfants *d'un premier lit,* comme dans le cas actuel, l'art. 1745 apporte une modification au droit général tracé par l'art. 1480, qui permet certaines dispositions en faveur de l'époux survivant. *Lex autem prohibet quod facilius fieri putat. ff De regulis juris.*

Le législateur s'est montré si soucieux de fixer les droits des enfants d'un premier mariage, que, dans l'art. 1746, il dit, que si l'époux qui passe à de secondes noces a des enfants de son précédent mariage, il ne peut rien donner des biens qui lui ont été donnés ou légués par le prédécédé.

*Depas* croit avoir établi, par ce qui précède, que *Nanette Riez* ne saurait avoir droit aux deux tiers des biens du défunt, indépendamment de sa moitié, dans la communauté ; il croit avoir établi qu'elle a droit au cinquième en usufruit

seulement qui lui est attribué par le jugement. A l'appui de ces doctrines il invoque les autorités suivantes :

Jurisprudence du C. N. vol. 2, pages 235 à 237. Toullier, vol. 5, nos. 869, 871 et 871 bis. Bousquet, Exposition du Code Civil, vol. 3, page 375. Duranton, vol. 9, sec. 787 à 799. Malleville, Analyse du Droit Civil, vol. 2, pages 470 à 472. Code Civil, art. 1736 à 1739. Arrêt de la Cour Suprême de notre Etat, dans la succession Albert Hoa.*

Le système de défense adopté par *Nanette Riez* sera sans doute le même ici que devant la Cour inférieure. Voici en quoi il consiste :

Le testateur et la légataire (*Nanette Riez*) avaient, le premier, la capacité de donner ; la seconde, celle de recevoir. Art. 1456 du C. C. Les incapacités sont absolues ou relatives, art. 1457 ; *Nanette Riez* ne pouvait être atteinte que de la dernière ; il faut qu'on le prouve. La capacité de donner existait chez le testateur au moment ou il a donné. La loi française n'est pas la même que la nôtre. Il ne faut donc pas recourir aux autorités étrangères pour décider la question. L'arrêt rendu dans l'affaire *Hoa*, l'a été ex parte ; le juge qui a délivré l'opinion de la cour a posé un principe erroné ; cette décision est isolée, elle ne peut pas à elle seule former jurisprudence ; elle ne doit être d'aucun poids dans la cause. On ne doit jamais prendre un texte de loi isolément. L'art. 1480 se trouve bien dans le livre du Code Civil des Donations et Testaments, mais il est sous le chapitre 3, *de la portion disponible et de la réduction en cas d'excès*, tandis que les articles 1739 et 1745, sont placés sous le chapitre 9, intitulé, *Des donations entre époux, soit par contrat de mariage, soit durant le mariage*. Dès lors, ils ne peuvent pas former une exception à la regle générale tracée par l'art. 1480. La donation faite par le testateur est une donation faite pendant le mariage, et non une donation pour cause de mort.

Sur le premier point, nous admettons que le testateur, au moment du testament, comme à celui de l'ouverture de la succession, avait le droit de faire une institution au profit de *Nanette Riez :* que cette dernière avait le pouvoir de recevoir ou d'accepter le legs fait en sa faveur ; avec cette restriction d'épouse de *Phinias Depas*, ayant des enfants du premier lit, la portion qui pouvait lui être léguée, devait être réduite en conformité du droit restrictif, tracé par l'art. 1745 du C. C.

Quant au second, que la loi française n'est pas la même que la nôtre, et que les commentateurs étrangers ne doivent exercer aucune influence dans la cause. La meilleure réponse à faire à cette doctrine, assez curieuse pour le dire en passant, c'est de mettre en regard les deux textes :

| CODE NAPOLEON. | CODE CIVIL DE LA LOUISIANE. |
|---|---|
| *De la portion des biens disponibles et de la réduction.* | *De la portion disponible et de la réduction en cas d'excès.* |
| Art. 913.—Les libéralités, soit par acte entre vifs, soit par testament, ne pourront excéder la moitié des biens du disposant, s'il ne laisse à son décès qu'un enfant légitime ; le tiers, s'il laisse deux enfants; le quart, s'il en laisse trois ou un plus *grand* nombre. | Art. 1480.—Les donations, soit entre vifs, soit pour cause de mort, ne pourront excéder les deux tiers des biens du disposant, s'il laisse à son décès un enfant légitime ; la moitié, s'il laisse deux enfants; le tiers, s'il en laisse trois ou un plus grand nombre. |
| Art. 914.—Sont compris dans l'art. précédent sous le nom d'enfants, les descendants en quelque degré que ce soit ; néanmoins ils ne sont comptés que pour l'enfant qu'ils représentent dans la succession du disposant. | Sous le nom d'enfants, sont compris les descendants en quelque degré que ce soit; bien entendu qu'ils ne sont comptés que pour l'enfant qu'ils représentent. |
| Art. 1094.—L'époux pourra, soit par contrat de mariage, soit pendant le mariage pour le cas où il ne laisserait point d'enfants ni descendants, disposer en faveur de l'autre époux, en propriété, | Art. 1739.—L'époux peut, soit par contrat de mariage, soit pendant le mariage pour le cas ou il ne lasserait point d'enfants, ni descendants légitimes, donner à l'autre époux, en toute pro- |

---

* Le Code Napoléon art. 920, déclare que de semblables donnations sont reductibles. Il emploit ces mots, *dispositions soit entre-vifs soit à cause de mort.* Rogron, sur ce même article dit, que par ces derniers mots on entend les donnations par testament. Loi 5 Code, tit. 9, de secundis nuptiis. Hac edictati. Pothier, traité du Contrat de mariage, vol. 5, partie 7, chap. 2 de l'édit des secondes nuces, no 547.

34

### CODE NAPOLEON.

de tout ce dont il pourrait disposer en faveur d'un étranger, et, en outre, de l'usufruit de la totalité de la portion dont la loi prohibe la disposition au préjudice des héritiers Et pour le cas où l'époux donateur laisserait des enfants ou descendants, il pourra donner à l'autre époux ou un quart en propriété et un autre quart en usufruit, ou la moitié de tous ses biens en usufruit seulement.

Art. 1098.—L'homme ou la femme qui, ayant des enfants d'un autre lit, contractera un second ou subséquent mariage, ne pourra donner à son nouvel époux qu'une part d'enfant légitime le moins prenant, et sans que, dans aucun cas, ces donations puissent excéder le quart des biens.

### CODE DE LA LOUISIANE.

priété, tout ce qu'il pourrait donner à un étranger. Et pour le cas où l'époux donateur laisse des enfants ou descendants légitimes, il peut donner á l'autre époux, ou un dixième en propriété, ou le cinquième de tous ses biens en usufruit seulement.

Art. 1745.—L'homme ou la femme qui contractera un second ou subséquent mariage, ayant des enfants d'un autre lit, ne pourra donner à son nouvel époux qu'une part d'enfant le moins prenant, et en usufruit seulement, sans que, dans aucun cas, la portion dont le donataire aura l'usufruit puisse excéder le cinquième des biens du donateur.

On le voit donc par le rapprochement des articles qui précèdent dans les deux législations, les principes sont les mêmes ; la seule différence, c'est que dans la loi française la portion dont peut disposer le testateur ou le donateur est plus grande que chez nous.

Aussi est-ce la justification complète de ce motif donné par cette cour dans l'affaire de la succession *Hoa*, que les seconds mariages étant chez nous assez fréquents, c'était à la justice et aux magistrats à accorder aux enfants la protection qui a été écrite dans la loi en leur faveur.

Il serait donc superflu de discuter plus longuement sur ce point.

Quant au troisième, que l'arrêt prononcé dans la dernière affaire qu'on vient de citer, a été rendu *ex parte*, et que le juge qui a donné l'opinion de la cour s'est trompé :

Je réponds : 1o. Que la cause a été plaidée par écrit sur le mémoire de deux avocats, et qu'il ne s'en suit pas que lorsqu'un procès est plaidé *exparte*, justice ne soit pas rendue, car tout le monde sait, et le barreau surtout, que vos décisions ne sont jamais rendues que sur l'examen le plus approfondi et le plus consciencieux de la cause.

2o. Quant à l'erreur dans laquelle l'honorable magistrat serait tombé, c'est une assertion gratuite, que non seulement rien ne justifie, mais encore que tout repousse, et l'arrêt lui-même, tant il est écrit avec soin, tant les doctrines qui y sont professées sont développées avec force et soutenues par les autorités les plus respectables.

Sur le quatrième, relatif à ce que les art. 1739 et 1745 ne forment pas une exception à l'art. 1480 : Il suffit d'observer qu'ils sont tous placés dans le même livre du Code, celui qui traite des *donations et testaments ;* ils sont tous compris dans la matière générale qu'embrasse ce livre : rien ne saurait donc empêcher que les art. 1739 et 1745 ne fussent une modification à l'art. 1480.

Toutefois *Nanette Riez* prétend de ce que les art. 1739 et 1745 ne sont pas placés dans le même chapitre que l'art. 1480, ils ne peuvent pas établir une modification ou une exception à ce dernier article ; puis elle ajoute que cela doit être ainsi, parce que le législateur, après avoir parlé du disponible général, ne s'explique pas immédiatement après sur le disponible *relatif aux époux*; dès-lors il ne faut pas, dit elle, avoir aucun égard à l'article 1745. Elle commet une erreur que le besoin de sa cause peut seul justifier, en disant que l'article 1480 se trouve dans le chapitre du Code intitulé *des Donations et Testaments*, et que les articles 1739 et 1745 se trouvent dans le chapitre intitulé *des Donations entre Epoux*, soit par contrat de mariage, soit pendant le mariage. La vérité est que ces deux chapitres se trouvent, le premier sous la dénomination, *De la portion disponible et de la réduction en cas d'excès ;* le second sous la dénomination, *Des Donations entre époux, soit par Contrat de Mariage soit durant le Mariage.* Tous les deux sont dans le même titre, intitulé, *Des Donations et Testaments.* Que si ces deux articles 1739 et 1745, ajoute-elle, se trouvaient dans le même chapitre que l'article 1480, alors elle ne prétendrait plus qu'ils ne fussent une exception au disponible général tracé par l'art. 1480,

et qu'ils n'établissent un disponible relatif à l'égard des époux. Quoi donc de plus naturel de la part du législateur que de parler dans le même titre *des Donations et Testaments*, d'abord du disponible générale et de la légitime, et de réserver ensuite le disponible relatif aux époux pour le chapitre où il traite spécialement des donations entre époux, soit par contrat de mariage, soit pendant le mariage.

*Nanette Riez* dit qu'elle sera convaincue si on peut lui prouver que le legs qui lui a été fait n'est autre chose qu'une donation à cause de mort. La donation a été faite, dit-elle, pendant le mariage : ce n'est donc pas une donation *causa mortis:* ce serait donc, suivant elle, une donation entre-vifs. Qu'est-ce que la donation entre-vifs? Merlin, Rép. de Jurisp. Vo. Donation, sect. 1, § 1, la définit ainsi :

" Une donation entre-vifs est la disposition de certaines choses dont le donateur se dessaisit, en faveur de celui auquel il donne. Cette donation se fait par un principe de libéralité, *avec une intention absolue et déterminée de se dépouiller de la chose donnée sans pouvoir jamais revoquer cette libéralité.*" Code Civil, arts. 1454 et 1455.

*Nanette Riez* serait elle d'avis, par hasard, que le testateur n'avait pas le droit de révoquer son testament jusqu'au moment de son décès? Nous ne lui faisons par l'injure d'une absurdité aussi capitale. Si donc le testateur pouvait révoquer son testament, il ne se dépouillait pas du legs qu'il lui faisait, ce legs etait essentiellement révocable, et cette révocabilité, loin d'en faire une donation entre-vifs, en faisait une donation *causa mortis*, puisqu'elle ne devait recevoir d'effet que par l'évènement de la mort du testateur, en un mot, *à cause de sa mort.*

Poursuivons : Dalloz, Jurisprudence du Royaume, vol. 5, Dispositions entre-vifs et testamentaires, chap. 3, sect. 3, art. 2, p. 447, dit:

"*La donation de ce dont la loi permet de disposer est une véritable donation à cause de mort* ; car ce n'est qu'au décès du donateur que l'on pourra connaître la consistance d'une pareille donation, qui varie suivant *le nombre et la qualité* des héritiers, suivant les acquisitions, les dettes qui existeront à cette époque."

Prenez le testament de Depas, et vous verrez qu'il se sert des mêmes expressions de Dalloz ; car il déclare donner à Nanette Riez *tout ce dont la loi lui permet de disposer.* C'est donc une donation à cause de mort.

Ajoutez à cette autorité celle de Duranton, déjà citée, vol. 8, p. 303, no. 282, qui nous enseigne que la loi ne fait aucune distinction entre les dispositions entre-vifs et les dispositions testamentaires, quand il s'agit de la fixation de la portion disponible, *la réserve devant toujours être intacte.* Dalloz, Jurisprudence du Royaume, vol. 6, p. 271, et suivantes, rapporte un arrêt dans le même sens. *Alauzun* v. *Alauzun.* Le même auteur, même volume, pages 276 et 277, explique comment doit s'entendre la quotité disponible entre époux, ayant des enfants d'un précédent mariage, et consacre les principes avancés par Charles Depas.

II. *Le testateur a-t-il pu dispenser Nanette Riez de fournir caution?*

Charles Depas soutient la négative, et demande sur ce point que le jugement de la cour inférieure soit réformé. Suivant lui, Nanette Riez doit être tenue de fournir caution pour le legs de son usufruit. En effet ce legs consiste en immeubles et en meubles, Ces derniers objets sont non seulement soumis à une détérioration journalière, mais encore une fois, en la possession de Nanette Riez, qui pourra l'empêcher d'en disposer, et sans cautionnement que devient le droit de propriété de Charles Depas sur ces mêmes objets ? Il est vrai de dire que, d'après l'art. 551 de notre Code, l'usufruitier doit donner caution de jouir en bon père de famille ; mais il faut reconnaître en même temp que, d'après l'art. 552 du même Code, il peut être dispensé de fournir caution par le titre constitutif de l'usufruit. On a prétendu que c'était le cas. On s'est mépris, ainsi qu'on va le voir plus bas. Avant de le démontrer, qu'il soit permis de rappeler que le Code Napoléon renferme les mêmes dispositions dans l'art 601.

Qu'on n'oublie pas qu'il s'agit ici de la quotité disponible et de la réserve légale réclamée par un héritier forcée.

Dispenser *Nanette Riez* de fournir caution, n'est-ce pas excéder la quotité disponible, puisqu'elle pourra vendre et aliéner les meubles ou valeur mobilières soumises à son usufruit; et Charles Depas rester ainsi privé de sa propriété, sans recours et sans remède pour assurer son droit ? N'est-ce pas, en outre, donner en jouissance à *Nanette Riez* des objets que rien ne pourra lui faire restituer à la fin de son usufruit, si elle a jugé convenable d'en disposer avant

qu'il prenne fin.   Le cautionnement est le seul moyen de conserver le droit de l'héritier.   N'est-ce pas d'un autre côté, toucher à la réserve légale qui doit être sacrée, qui ne peut en aucune manière être entamée ni altérée; ce qui arriverait cependant, si l'époux donateur pouvait dispenser son conjoint de donner caution pour la part des biens qui lui est léguée en usufruit seulement, *puisqu'alors cette nue-propriété conservée, par la loi aux enfants, deviendrait illusoire par l'insolvabilité de l'usufruitier.*

Voici les autorités.   Dalloz, Jurisprudence du Royaume, au mots, Usufruit, Usage et Habitation, volume 12, page 805, no. 31, dit: "L'obligation de donner caution souffre exception dans plusieurs cas; ainsi, 1o. l'acte constitutif de l'usufruit *peut en dispenser*, sauf toutefois l'application des règles concernant la quotité disponible, car autrement l'insolvabilité de l'usufrutier pourrait blesser les droits de ceux au profit desquels la loi fait la réserve."  Proudhon, tome 2, no. 824, et suivants.   Duranton, tome 4, no. 611.   Dalloz, Dictionnaire de Jurisprudence, Verbo Usufruit, page 622, art 6, § 3, no. 484.   Même auteur, Recueil périodique, 2me partie, année 1826, page 131, *Héritiers Michel* v. *Martin.*   Même auteur, même recueil, année 1833, 2me partie, page 188, *Soto mayor*, v. *Guilles.*   Même auteur, même recueil, année 1837, même partie, page 88, *Coustard* v. *Ses Enfants.*

III.   *Est-il ou n'est-il pas dû récompense par la communauté à Nanette Riez, soit pour les améliorations réclamées par elle et alléguées par le testateur dans son testament, soit pour le billet de $1,100 souscrit par le défunt avant son mariage avec Nanette Riez, et payé environ neuf mois après ce mariage.*

La communauté n'a droit à aucune récompense pour ce qui regarde les améliorations.

L'art. 2377 du Code Civil dispose: "Lorsque l'héritage propre à l'un des époux a été *augmenté ou amélioré* pendant la durée du mariage, il sera dû récompense de la moitié de la valeur de ces *augmentations ou améliorations* à l'autre époux ou à ses héritiers, s'il est prouvé que ces *augmentations ou améliorations* sont le fruit du travail, des dépenses ou de l'industrie commune; mais il ne sera pas dû de rocompense s'il est prouvé que l'augmentation n'est due qu'au cours ordinaire des choses, à l'accroissement de la valeur des propriétés et aux chances du commerce."

L'art. 1437 du Code Napoleon est ainsi conçu:  "Toutes les fois qu'il est pris sur la communauté une somme, soit pour acquitter les dettes ou charges personnelles à l'un des époux, tel que le prix ou la partie du prix d'un immeuble à lui propre, ou le rachat de services fonciers, soit pour le recouvrement, la conservation ou l'*amélioration* de ses biens personnels, et généralement toutes les fois que l'un des deux époux *a tiré un profit personnel* des biens de la communauté, il en doit la récompense."

Après la lecture de ces deux articles, on voit que s'ils diffèrent dans leurs expressions, leur intention, leur sens et leurs dispositions sont les mêmes, et de plus tous les deux nous enseignent que pour qu'il y ait lieu à récompense, il faut des améliorations qui *profitent à l'un ou à l'autre des époux.*

Appliquons-les maintenat à la cause: Le propre dont il s'agit a été acquis par le défunt sept mille cent piastres.   Acte du 8 août 1836.   Il a été estimé à la dissolution de la communauté six mille piastres.   L'inventaire fait à la requête de Nanette Riez, et homologué sur sa demande, établit ce fait.

D'après l'art. 1247 du Code Civil, "Tout partage en justice doit être précédé d'un inventaire estimatif de tous les biens à partager, fait dans la forme prescrite pour les inventaires publics."   Cette formalité a été remplie.

Suivant l'art. 1248: "L'inventaire public qui aurait été fait entre les parties intéressées, à une époque qui ne serait pas *antérieure de plus d'un an à la demande en partage, devra servir de base à ce partage*, à moins que l'un *des héritiers ne demande une nouvelle estimation*, et ne prouve que les biens compris dans cet inventaire n'ont pas été portés à leur juste valeur, ou à celle qu'ils ont acquise depuis la date de cet acte."

C'est le 10 février 1846 que *Charles Depas* a intenté la demande en partage, huit mois et quelque jours après l'inventaire.   *Nannette Riez* n'a pas demandé de nouvelle inventaire, elle l'a fait homologuer.   La propriété ayant été acquise par le défunt *sept mille cent piastres*, et n'ayant été estimée avec les améliorations que six mille piastres, il n'y a donc pas accroissement de valeur, mais bien diminution, par conséquent il n'y a pas lieu a récompense.

Il y a d'ailleurs une autre raison pour qu'il n'en soit pas ainsi: non seulement

l'immeuble n'a pas été amélioré, mais les fruits que ce propre a produit durant l'existence de la communauté, ne lui ont-ils pas profité? cette même communauté n'en a-t-elle pas joui? elle les a absorbés, et elle à joui autant du propre que des améliorations. Les commentateurs sont d'accord sur ce point.

Pothier, Traité de la Communauté, vol. 4, chap. 1, art. 4, pages 202 et 203, no. 636, s'exprime ainsi sur cette question: "Au contraire, la récompense pour impenses utiles n'est due qu'autant et jusqu'à due concurrence de ce que l'héritage propre de l'un des conjoints sur lequel elles ont été faites, *se trouve en être plus précieux au temps de la dissolution de la communauté,* suivant l'estimation qui doit en être faite par experts" Même auteur, Traité des Donations entre mari et femme, chap. 1, vol. 4, page 304, no. 57, dit: "Sur la demande en revendication, l'héritage doit être délaissé en l'état qu'il se trouve avec ce qui a été uni et qui en fait partie, à la charge néanmoins de rembourser au possesseur les impenses qu'il a faites à l'héritage *jusqu'à concurrence de ce qu'il s'en trouve plus précieux.*" Enfin, le même commentateur, à l'introduction au titre dix de la Communauté, vol. 7, chap. 6, page 186, au no. 121, *in fine,* après avoir examiné les différentes dettes dont chacun des conjoints peut-être tenu envers la communauté, s'explique comme suit: "Cette raison ne milite pas à l'égard des impenses utiles qu'il aurait pu se dispenser de faire: c'est pourquoi la récompense pour ces impenses n'est dû que *jusqu'à concurrence de ce que l'héritage sur lequel elle a été faite s'en trouve être plus precieux au temps du partage de la communauté.*" "Au reste, *quelque précieux que soit devenu l'héritage,* la récompense ne peut jamais être plus que ce qu'il en a coûté à la communauté, suivant le 3me principe du § 1."

A cette opinion dejà si recommandable, se joignent les suivantes: Toullier, vol. 12, page 504, après avoir parlé des différentes espèces d'impenses, ajoute: "Il y en a donc de deux espèces, comme on le voit; les unes son dues lorsque l'un des conjoints a *enrichi la communauté aux dépens de ses biens propres immeubles ou meubles;* les autres, *lorsqu'il s'est enrichi aux dépens de la communauté.*"

*Nanette Riez* oserait-elle soutenir que la propre de son mari s'est enrichi aux dépens de la communauté?

On trouve dans le même auteur, vol 13, pages 228 à 241, nos. 166 à 167, le passage suivant: 2o. "On conclut encore des distinctions ci-dessus, que les impenses de la seconde espèce, *ou améliorations seulement utiles,* qu'on pourrait se passer de faire, *mais qui augmentent le prix ou la valeur de l'héritage* où elles sont faites, ne sont ni à la charge de la communauté seule, ni à la charge seule du conjoint propriétaire, et qu'elles *ne sont dues par ce dernier que jusqua'à concurrence de ce que l'heritage se trouve avoir acquis de plus-value au temps de la dissolution de la communauté par suite des améliorations ou réparations qui y ont été faites pendant sa durée.*"

Toullier ajoute ensuite qu'un arrêt de la Cour Royale de Bordeaux, du 27 mai, 1827, rapporté par Boyer, tome 2, page 236, a confirmé cette doctrine.

Dalloz, Jurisprudence du Royaume, vol. 10, au mot Contrat de Mariage, chap 1er, sect. 1er, art. 2, nos. 52 et 56, page 224, professe la même doctrine. "Les impenses utiles, dit-il, c'est-à-dire celles qu'on pouvait se dispenser de faire sans exposer l'héritage à périr'ou se détériorer, *mais qui augmentent le prix de l'héritage* sur lequel elles sont faites, ne s'évaluent que jusqu'à concurrence de ce dont elles ont, à l'époque de la dissolution de la communauté, *augmenté la valeur de cet héritage;* on ne peut plus dire ici que l'époux propriétaire ait été dans l'alternative d'employer à ces impenses les deniers de la communauté ou les siens propres, *car elles n'étaient point indispensables; il aurait pu ne pas les faire.* Il ne profite douc pas, comme dans le cas d'impenses nécessaires de toute la somme fournie par la communauté, il n'en profite que jusqu'à concurrence de *l'augmentation de valeur que son héritage, à la dissolution de la communauté,* se trouve avoir éprouvé à raison de ces impenses; ce n'est donc que *du montant de cette plus-value qu'il est dû récompense.*"

Paillet, annotateur du Code Napoléon, est de la même opinion sur l'article 1437.

La Cour Royale de Paris a, dans un arrêt rapporté au Journal du Palais, vol. 1814, 1815, page 275, *Millet* v. *Millet,* sanctionné les mêmes principes, en les étendant, il est vrai, jusqu'aux impenses de luxe, quand l'héritage sur lequel elles ont été faites en a été *enrichi* ou *amélioré.*

Duranton, vol. 14, page 453 à 456, nos. 323 à 324 inclusivement, s'exprime ainsi: "Au lieu que lorsque la dépense était simplement *utile,* comme lorsqu'il

a été fait une vigne d'une terre labourable de l'un des époux, ou qu'*un bâtiment a été construit sur le terrain de l'un d'eux*, l'époux *propriétaire ne doit récompense à la communauté que de ce dont il se trouve réellement plus riche lorsqu'elle se dissout, par conséquent de la plus-value seulement que la dépense a procuré à son fonds; le surplus doit être considéré comme une dépense perdue, une fausse spéculation, qui reste par cela même à la charge de la communauté, encore que ce soit sur le fonds du mari qu'elle ait été faite.*"

Cette opinion, qui semble avoir été écrite pour la cause actuelle, a été plusieurs fois corroborée par notre Cour Suprême, dans les affaires *Babin* v. *Nolan*, 4 Rob. 286. 6 Rob. 514. *Waggaman* v. *Zacharie*, 8 Rob. 181.

A ces opinions déjà si respectables, on peut ajouter Merlin, Vo. Améliorations, § 2, vol. 1, page 364. Même auteur, Vo. Recompense, sect. 1, § 4, page 242.

Or, en présence des divers textes de loi déjà rappelés, et de la jurisprudence et de l'unanimité des commentateurs, comment en l'absence de ce concours qu'il n'y a pas d'augmentation de valeur, qu'il n'y a pas d'améliorations, que le conjoint n'est pas devenu plus riche, peut-on accorder récompense même pour cinq cent piastres? La communauté n'a-t-elle pas d'ailleurs été récompensée déjà par les loyers qu'elle a perçus pendant dix ans, par le logement qu'ell a eu sur cette même propriété? Il y a mieux; d'après l'art. 1248, l'inventaire public qui aurait été fait entre les parties, à une époque qui ne serait pas anterieure de plus d'un an à la demande en partage, *devra servir de base à ce partage*, à moins que l'un des héritiers ne *demande une nouvelle estimation*, et ne prouve que les biens compris dans cet inventaire n'ont pas été portés à leur juste valeur, ou à celle qu'ils ont acquise depuis la date de cet acte.

Or, d'après cet article, l'inventaire fait *doit servir de base au partage. Nanette Riez* ne conteste pas que l'action en partage n'ait été intentée avant l'expiration du terme d'un an, dont parle cet article; ells n'a pas demandé une nouvelle estimation, elle a fait homologuer cet inventaire. Si donc on alloue une récompense à *Nanette Riez*, on ne prend plus l'inventaire pour base du partage, on viole la loi qui dit que cet inventaire *devra servir* de base au partage.

*Est-il dû récompense pour le billet de* 1,100 *piastres?*

Pour établir son droit à cette récompense, *Nanette Riez* se retranche dans le présomption légale; le billet a été payé, dit-elle, neuf mois après mon mariage avec *Phinias Depas*, c'est-à-dire durant l'existence de la communauté. Donc, il l'a été des fonds de la communauté. *Nanette Riez* n'a rien apporté en mariage à son mari, pas un seul meuble; elle n'exerçait aucune industrie, n'avait aucune profession; ce qui ne nous empêche pas de reconnaître qu'elle a dû participer aux bénéfices *réels et véritables* de la communauté, mais non à ceux qui était en dehors. Le mari est le chef de la communauté, *il peut disposer des biens qui la constituent, même pour éteindre ses obligations personnelles.* A l'époque de l'échéance du billet de 1,100 piastres, la communauté ne possédait aucune espèce de propriété, si ce n'est le propre de *Depas* et le fruit de son industrie personnelle d'arrimeur (stevedore.) Si donc à cette époque, la communauté ne possédait rien, ce n'est pas avec ses fonds que le billet a été éteint.

*Gedge* and *Rozelius*, for the appellant. The defendant is entitled, under the will, to two thirds of the individual estate of the deceased and of his share of the community property. The will gave her all the disposable portion, and the question therefore is, what could the deceased dispose of by *testament?* This portion is to be ascertained by art. 1480 of the Civil Code, and not by art. 1745, as the plaintiff contends. Art. 1480 lays down the general rule by which the disposable portion is to be ascertained, and its language is clear and free from ambiguity. If any exception exists to this rule it must be equally clear; an exception to a general and positive law, cannot be created by inference. "All persons may dispose of or receive by donation inter vivos or mortis causa, except such as the law *expressly* declares incapable." C. C. 1456. If therefore any exception exists incapacitating deft. from receiving the quantum allowed by art. 1480, it must *expressly declare* it. Is such an exception found in art. 1745? It says, "a man or woman who contracts a second or subsequent marriage, having children by a former one, can give to his wife, &c." This article forms a part of the 9th chap. of the general title of Donations and Testaments, and professes to treat specially "*of Donations between married persons, either by marriage contract or during the marriage;*" it must therefore be confined to those two cases, and being a limitation or exception to the general rule laid down in art. 1480, cannot be carried further by implication; and as it creates an incapacity,

that incapacity must be *expressly declared* according to art. 1456. This is clearly not a donation by marriage contract; and we have only to ascertain whether a testamentary bequest, is a donation during marriage.

By our laws all gratuitous dispositions of property are reduced to the two forms of donations *inter vivos* and testaments (C. C. 1453, 1563); the donation *mortis causa* being abolished. " A testament is the act of last will, &c." C. C. 1564. Le Nouveau Ferrière, vol. 3, p. 401, says: " Le testament, est une déclàration et une ordonnance solennelle de ce que nous voulons être exécuté aprés notre mort,'" "- - - qui marque les derniéres volontés d'une personne au sujet de ses biens aprés sa mort." "Elle contient une disposition de derniere volonté, qui ne commence par conséquent à avoir effet qu' àprès la mort du testateur, &c." To the same effect is art. 895, of the Code Nap. Inst. (b. 2, tit. 10, dig. 6, 28, tit. 1,) " Testamentum est voluntatis nostra justa sententia de eo quod quis post mortem suam fieri velit." "Les mots enfin, de ' *eo quod quis post mortem suam fieri velit*,' nous font connaitre que la volonté de l'homme étant *ambulatoire* jusqu' à sa mort, le testament ne devoit avoir d'effet qu' aprés le décés du testateur. A dater de ce moment, cet acte était considéré comme une loi domestique." D'Esquiron, Traité de Test. vol. 1, p. 7. To the same effect is Grenier, vol. 1, page 396, no. 222, et seq.

A testament therefore has no legal existence until the death of the testator, or, in other words, until the marriage has ceased and been dissolved by that event. Now a donation during marriage evidently means, a donation to have existence and effect during marriage, and must be a donation *inter vivos*. A donation is a gratuitous disposition of property, and imports, like every other alienation, the transfer of the rights of the donor to the donee, a *jus ad rem* immediately on its execution, a *jus in re* immediately on its acceptance. This right is vested irrevocably in donations *inter vivos*. It is revocable as between husband and wife. " A donation *inter vivos*, is an act by which the donor *divests* himself at present and irrevocably of the thing given in favor of the donee who accepts it. C. C. 1454. Code Napoléon, art. 894.

The French commentators draw a marked distinction between Donations and Testaments. Boileux, Com. on the C. N. vol. 1, p. 563 and 564, remarks : " Il existe entre les donations et les testaments des différences essentielles ; la donation est un contract, car elle nécessite le concours de la volonté du donateur et du donataire ; le testament est un acte, car il est l'ouvrage du testateur seul. Le donateur se dépouille actuellement, le testateur ne se dépouille pas ; il dispose pour le temps où il n'existera plus. La donation est irrévocable, le testament peut être révoqué jusqu' au dernier instant de la vie." Vide also Rogron, Com. 441, 442 and 443, and the other authors. By using the terms *testament*, and *donation*, constantly in contradistinction to each other, both our own and the French law givers have expressed, in the clearest possible manner, the distinction between the two. Both Codes treat especially of " Donations and Testaments," and the testament is never called a *donation*, but a *disposition*. How strong is the language of M. Joubert, in presenting the provisions of the French Code : " La distinction des dispositions de derniére volonté en testaments et donations à cause de mort ne subsiste plus; on ne reconnait qu'une seule espéce de dispositions de derniére volonté ; elles s'appelleront testaments." See Boileux, vol. 1, p. 564.

It may be objected that our Code makes use of the term "*donation mortis causa*," and that a testament is a *donation* of that kind ; but this grows out of a misuse of terms in the text of the Code, when the peculiar sense attached to them has ceased to exist, and been actually abolished by the book itself.

Our law knows but one kind of *donation*, that *inter vivos ;* although it admits of two methods of gratuitous *disposition*, the *donation* and *testament*—the *donation mortis causa* has no existence. It is true that arts. 1453 and 1455, and other articles of the Code, make use of the term *donation mortis causa*, but it is used without definite meaning, or any intention on the part of the legislature to continue or create that species of disposition in the sense and meaning in which it was known to the Roman laws, and merely to designate the difference between the true donation (that *inter vivos*) and the testament. For the whole title is designated, Of *Donations and Testaments ;* and the chap. 6, treats of *Dispositions mortis causa*, and art. 1563, sec. 1 of that chapter, says : " no disposition *mortis causa* shall henceforth be made, otherwise than by last will or testament; all other form is abrogated." A man may call his last will by any

Depas
*v.*
Riez.

DEPAS
*v*
RIEZ.

name he please, but if it be a real testamentary disposition, clothed with all the forms necessary for that act, the law will call it and treat it as a testament, although he may have termed it a donation *mortis causa.* Art. 1563. If any thing could be drawn from the previous articles of the Code to create a presumption that the testament was *a donation mortis causa*, the title of the chapter 6 puts the matter at rest, by professing to treat of *Dispositions mortis causa*, when it comes to speak of the testament. We will not quibble at the definition although not strictly correct. The old *donation mortis causa*, was litterally so, it was always made in prospect or under fear of death or great danger, in contradistinction to the testament which might be made at any time when no such impression was entertained, and was only considered an act of last will; hence the name given to the first, and which was never applied to the latter. The French Code has escaped this inconsistency, and the confusion it may produce to a superficial examiner, by wisely abstaining from the use of a term which could have no meaning, when the thing it represented had ceased to exist in their system.

The difficulties attending the " *donation mortis causa*" of the old laws, are well known, for time and encroachments had so changed its original and well-marked character, and so nearly assimilated it to the testament, as to produce confusion as to its real nature, or to make it in a measure a substitute for that act. Much of this difficulty grew out of the necessity of *acceptance of the donation mortis causa*, which, together with its vesting the donee with the *jus ad rem* or *in re*, gave the act its affinity to the true donation (*inter vivos*); its revocability gave it its similarity to the testament. It was the object and intention of the compilers of the Code, following those of the Code Napoléon, to abolish forever this ambiguous act, and to reduce all gratuitous dispositions, as they have, to the two forms of *donation* and *testament.* Only two forms of donation were ever known, *inter vivos* and *mortis causa.* The testament was never called or considered a *donation*, and we have before shewn that it is not so now; and consequently, if the *donation mortis causa* is abolished, there can only remain the *donation inter vivos*; and consequently, when the Code treats of " *donations between husband and wife during marriage*," it has reference to the only donation known to our laws, the donation *inter vivos.* Unless the wife obtain a right in or to the thing during the marriage, there can be no donation to her during that period. Now it is clear that the testament gives no right *in presenti*, nor could any be claimed or taken under it, during any period of the coverture ; for until the death of the testator, it had no effect.

That all gratuitous dispositions are now reduced to the two forms of *donation* and *testament*, vid. C. N. art. 893, and Rogron on that art. p. 442. Boileux, idem, vol. 1, p. 563, 564. Grenier, vol. 1, p. 102, et seq. p. 131, &c. Ibid, Traité de Donations, part 3, cap. 4, vol. 2, p. 100 et seq.

The judgment of the court was pronounced by

ROST, J. In this appeal, an action of partition instituted by the only son and heir of a testator against his step-mother, who is sole executrix and legatee under an universal title, has been, by consent of parties, consolidated with an opposition, made by the plaintiff, to the account of her administration rendered by the executrix.

The consolidated cases present the following questions for our consideration :

1st. To what share of the succession is *Nanette Riez*, the second wife of the testator, entitled, under a testamentary disposition giving her all that the law permits her husband to dispose of in her favor, either in full property or in usufruct, as she may elect, and dispensing her from giving security in case she should elect the usufruct.

2nd. Could the testator, leaving a forced heir, dispense her from giving security, as he has done?

3rd. What recompense is due to the community for moneys expended during its existence, in useful improvements on a town lot belonging to the testator at the time of his marriage ?

4th. Is a recompense due the community for eleven hundred dollars of the price of said lot, paid during the marriage?

5th. Of what property consisted the proper estate of the testator, at the time of his death.

6th. Is the account rendered by the executrix correct, and such as the law requires?

The court below having decided some of those points in favor of each of the parties and against the other, the defendant has appealed, and the plaintiff has asked, in his answer to the appeal, that the judgment be amended as to the points decided against him.

In addition to these consolidated cases, the plaintiff took a rule upon the defendant, to show cause why she should not be dismissed from the office of executrix, for having failed to deposit in bank the moneys of the succession, as required by the 3rd section of the act of 1837. That rule was made absolute, and the defendant appealed. By consent of parties, that appeal comes up in the same record.

I. The first question involved in this controversy was decided by us, in accordance with the view taken of it by the plaintiff's counsel, in the case of the *Succession of Hoa*, 1 Ann. Rep., 142.

We there held that the testamentary dispositions made by the husband to his wife, when he left children at his death, were governed by art. 1739 of the Louisiana Code, and that the rule laid down in art. 1480 was not intended to apply to donations between married persons. We further held that, the word *donations* used in art. 1739, was to be understood as embracing testamentary dispositions as well as donations *inter vivos*. Art. 1739 is not applicable to this controversy, but the interpretation put upon it on that occasion would bring the present case under art. 1745, which provides that a man who contracts a second marriage, having children by a former one, can give to his wife only the least child's portion, and that only as an usufruct, and that, in no case, shall the donation exceed the usufruct of one fifth of the donor's estate.

We have been asked to reconsider that decision, and have been glad to have an opportunity of doing so. The point it determines was never before presented to our courts, and has been considered by many as not free from difficulty. A thorough examination of the context of our Code, and of all the authorities within our reach, bearing at all on the subject, has satisfied us that we had taken at first a correct view of the law.

The error of the defendant's counsel arises from mistaking, as many able men have done before him, definitions for propositions, and arguing upon the supposition that there is in the subject of a definition a fixed idea, other than that contained in its attribute.

Taking the definitions given by the Roman laws, of donations *inter vivos* and donations *mortis causa*, as expressive of a fixed idea, independent of the positive enactments *in pari materiâ* found in those laws, and testing by the definitions thus understood the meaning of the positive enactments of our Code on the same subject, he has proved conclusively the non-existence of donations *mortis causa* under our laws. His is nearly the mental process by which Bishop Berkley thought he had proved the invisibility of distance, extension, figure, and magnitude.

Definitions have no meaning beyond that which those who use them intend they should have. When incorporated in a code, they exclusively refer to the

positive enactments inserted in that code on the subject of which they treat, and have no meaning beyond those enactments.

The intendment of the definitions of the Roman law must be sought in the compilations of Justinian. The meaning of those found in our Code, is to be deduced from that body of laws. It is true that the definition of donations *mortis causa*, is not in Louisiana what it was in Rome, and that we apply the same name to a different thing; but when it is considered that no two systems of philosophy adopt the same definitions of virtue and of liberty, it will appear neither strange nor unreasonable that the definitions of our legislators should at times differ from those of the Romans. Their definitions of donations *mortis causa*, is particularly full, pointed and explicit. The very first article on the subject of donations provides that, property may be gratuitously disposed of or acquired, by donations *inter vivos* or *mortis causa*, made *in the forms established by the Code*. Art. 1453. The only forms *established or permitted by the Code for donations mortis causa*, are testaments.

Art. 1455 defines what our lawgivers consider as donations *mortis causa*. Every subsequent chapter of the Code on the same subject, recognizes those donations with reference to last wills, and uses as synonymous the words *dispositions* and *donations mortis causa ;* nay, art. 1563 positively ordains that they shall be considered as synonymous.

" The name given to the act of last will is of no importance, and dispositions may be made by testament under this title, or under that of institution of heir, of legacy, codicil, donation *mortis causa*, or under any other name indicating the last will, provided that the act be clothed in the forms required for the validity of a testament, and the clauses it contains, or the manner in which it is made, clearly establish that it is a disposition of last will."

It is contended that art. 1745, which we consider as applicable to this case, is found in the chapter of *donations between married persons, either by mariage contract or during marriage ;* that donations made during marriage, must be such as can take effect during marriage ; and that, as a testamentary disposition does not take effect till after the marriage is dissolved, such a disposition does not come within the rule.

The difficulty which meets this argument is, that the donation of a child's part, whatever be its form, can have none of the essential requisites of a donation *inter vivos* ; it is revocable at pleasure, and the child's part, which is the thing given, cannot be ascertained before the number of the children, and their shares are fixed by the death of the donor. It is a donation of an uncertain portion of the property which he will leave at his death.

" *La donation de ce dont la loi permet de disposer est une véritable donation à cause de mort ;* car ce n'est qu'au décès du donateur que l'on pourra connaître la consistance d'une pareille donation, qui varie suivant *le nombre et la qualité* des héritiers, suivant les acquisitions et les dettes qui existeront à cette époque." Dalloz, vol. 5, Dispositions entre-vifs, p. 445. See also 5 Toull., no. 889. Poth., Cont. de Mar. nos. 595, 533, 547, 548. Grenier, Cont. de Mar. no. 684.

So that this argument cannot be carried to its legitimate conclusions, without depriving the husband of the right to make to his second wife a donation of any kind. There cannot be a doubt of the applicability of art. 1745 to testamentary dispositions, and the legacy in this case must be made to comply with its provisions.

The court of the first instance gave judgment in favor of the defendant for

DEPAS
<br>v.
<br>RIEZ.

one-fifth of the proper estate of the testator as a usufruct only, and ordered the property of the community to be equally divided between her and the plaintiff. In this we think there is error. Our laws do not justify distinctions founded on the nature or the origin of property. The power vested in the husband to give to his second wife the usufruct of a child's part, not exceeding one-fifth of his succession, extends to all the property of which he may die possessed, whether the same was brought by him into marriage, or subsequently acquired; otherwise the husband who brought nothing into marriage, however rich he might be, could make no donation to his wife. Such is not the intention of the law.

II. Art. 1485 of the Civil Code forbids testators to dispose of the legitimate portion to the prejudice of their descendants, and art. 552, which authorizes them to dispense the usufructuaries from giving security, must be construed with reference to that prohibition. The power to place the property, forming part of the legitimate portion, in the possession of the usufructuary, without such security as will ensure its return at the expiration of the usufruct, would enable testators to evade a regulation of public order. Such a power never can exist. Its existence is denied by the Courts of France, under dispositions of law similar to ours, and the argument upon which their decisions rest, appear to us unanswerable. Dalloz, Dict. de Jurisp. *verbo* Usufruit, no. 484. Same author, Recueil Périodique, 2de partie, 1826, p. 131. *Michel* v. *Martin*, same work, 1833, 2de. partie, p. 188. *Soto mayor*, v. *Guilles*. Same work, 1837, 2nde partie, p. 88, *Coustard* v. *His Children*. Proudhon, t. 2, no. 824 et seq, 4 Duranton, no. 611.

The court below erred in dispensing the defendant from giving the security required by articles 551 and 552 of the Civil Code.

III. A recompense is due to the community for the value of the useful improvements made during its continuance on the proper estate of the testator; but the distinction attempted to be established by the defendant's counsel between art. 2377 of our Code and art. 1437 of the Napoléon Code, is not perceived by us. The concluding part of the latter article is an explanation, not a limitation, of the first part of it. Both articles lay down the general rule that, a recompense is due the community for the value of the improvements made during marriage on the proper estate of the husband or wife, and the necessary inference from both is that, this value is to be determined, not at the time the improvements were made, but at the dissolution of the marriage. Neither the value of the property at the time of the marriage, nor the actual value of the improvements at the time they were made, are necessary to be taken into consideration. The improvements have benefited the community, by increasing the value and income of the property it has enjoyed to the day of its dissolution; from that day only, have the heirs of the testator profited by them, and the profit can not exceed their value at that time. If they should have cost more than that value, the difference is a bad speculation, a loss of the community, for which no recompense is due. 12 Toull. p. 213. Pothier, Traité de la Comm. vol. 4, no. 636. Same author, Donations entre mari et femme, no. 57. Dalloz., Jurisp. du Roy. *Verbo* Contrat de mariage. Duranton, vol. 14, pp. 453, 456.

We recognize as proper the rules laid down by the late Supreme Court in the case of *Babin* v. *Nolan*, 4th Robinson, 286, and 6th Robinson, 514, for the purpose of ascertaining the recompense due the community in such cases, and

although those rules have not been strictly pursued in this controversy, the evidence in the record is sufficiently explicit to enable us to do justice.

The mechanic who contracted for and made nearly all the improvements, and the brother of the testator, who knows all the improvements that have been made, proved that they did not cost over $800. The experts appointed by the judge reported that they were now worth over $1400, and the witness, *Barnett*, swears that, without them, the lot in St. Philip street, upon which they were made, would not now be worth, by nearly fifty per cent, what it cost the testator.

Whatever be the present value of the improvements, the recompense due the community for them cannot exceed their cost. See Pothier, de la Communauté, vol. 7, chap. 6, p. 186, et seq.

We infer from the report of the experts and the testimony of *Barnett*, that the improvements gave, at the time of the dissolution of the community, an additional value of $800 to the lot; this is the maximum of the recompense it can receive.

The assertion that the plaintiff could not disprove the declaration in the will that, the improvements cost $4,000, requires no answer.

IV. Any legal evidence is admissible to rebut the legal presumption that the note of $1,100, due seven months after the marriage, was paid out of the community funds. The plaintiff has shown that the defendant brought nothing into marriage, and that she exercised no separate trade or industry of any kind. He has further proved that, at the time of the marriage, the testator had in bank the sum of $526 25 cents, and that between that time and the maturity of the note, he deposited there $3,941 25, which, it is contended, could not be profits made at his trade of stevedore in the space of seven months. It would be very unsafe to take the credit side of the bank-book as the measure of the wealth of the testator; but this evidence was probably sufficient to put the defendant upon proof of the manner in which, and the time when, the testator became possessed of those funds, but this has not been attempted. There is, moreover, a circumstance in the cause, which, taken in connexion with that evidence, satisfies us that the note was not paid by the community. The testator describes with minuteness in his will, all the property and credits of the community, and, for the manifest purpose of evading the prohibition of the law, not to impair the legitimate portion of his son, he declares that the community is entitled to a recompense of $4,000 expended during marriage, in improvements on his proper estate, when, in truth, the sum thus expended did not exceed $800, and he does not mention the note of $1,100, as having been paid by the community. We infer from his silence that, it was not.

V. We are of opinion the court erred in considering the $526 25, which the testator had in bank at the time of his marriage, as forming part of the proper estate left by him at his death. It is shown that most of the sums subsequently deposited by him, were withdrawn almost as soon as deposited, and that what was not so withdrawn, would not have sufficed to pay half of the note of $1,100. We must presume, therefore, that an amount equal to the deposit, existing at the time of the marriage, was applied to its extinguishment.

The community is entitled to the enjoyment of all the property and effects belonging to the husband at the time of the marriage. Civil Code, art. 2371. We have just held one of the consequences of that legal right to be, that the recompense due the community for improvements made during marriage on the

proper estate of the husband or wife, is not, generally speaking, the whole cost of those improvements, but only their value at the time the community ceased to enjoy them.

The necessary result from this exposition of the law is, that the community owes no recompense for the diminution of value of the effects of the husband or wife, by reason of said enjoyment.

The plaintiff may take out of the community, in the condition in which they were at the death of the testator, the furniture and tools brought by him into marriage, but he is not entitled to be credited for their value, at the time the marriage took place. The only proper estate left by the testator, is the house and lot in St. Philip street, valued at $6,000.

VI. The account filed by the executrix is clearly erroneous. The debts of the community must be paid out of its assets. The property left by the testator, to one undivided share of which she is entitled, is only what will remain after payment of those debts. Whatever portion of the succession is necessary to pay them, belongs to his creditors, not to his heirs or legatees. The account must be amended, so as to charge her with the whole amount of the sums received by her, and also with the rent of the house she occupies, at the rate of $12 per month, and the hire of the slave *Clarissa*, at the same rate.

The counsel for the plaintiff alleges that she was not authorized to pay the debts of the succession; but as it is not denied that the debts placed upon the account were due, she must have credit for those she has paid, and account for the balance against her.

The evidence in the record does not show whether or not the property can be divided in kind. In order to ascertain that fact, and to enable the parties to submit to the court of the first instance any questions not settled by this opinion, which may arise in the course of the partition, it is necessary that the cause should be remanded.

It is therefore ordered that, the judgment be reversed, and the case remanded, with directions to the court of the first instance, to cause a partition of the property composing the succession of *Phinias Depas*, to be made between the plaintiff and the defendant according to law, and in conformity with the following rules:

1. The lot in St. Philip street, with the improvements thereon, to be considered as the only proper estate of the testator.

2. The community to receive a recompense of $800, for the value of the improvements aforesaid.

3. No notice to be taken of the note of $1,100, given by the testator for the balance of the price of said lot, and paid out of his private funds.

4. The account filed by the executrix to be amended, so as to charge her with the sum of $950 47. This sum, after deducting from it $807 28, the amount of the debts which, according to the account, she has paid for the succession, will leave against her a balance of $143 19, for which she must account to the succession, with legal interest from 13th March, 1846, the day of the filing of the opposition to her account.

5. A sufficient reserve to be made to satisfy the debts unpaid, and the necessary costs and expenses attending the settlement of the succession.

6. Out of the remainder, the defendant to receive one-half of the common property, or of its proceeds, as the case may be; and that, upon giving the security required by arts. 551, 552 of the Civil Code, she further receive one-fifth of

all the property composing the succession of *Phinias Depas*, or of its proceeds, as the case may be, as a usufruct only.

7. The plaintiff to receive, in full property, the other four-fifths of his father's succession, and the evidence of the securities which the defendant is bound to give.

It is further ordered, that the costs of this appeal be paid by the plaintiff and appellant, in equal portions.

There is no error in the judgment of the court below, dismissing the executrix from office. The 3d sect. of the act of 1837 is imperative, and it is not pretended that she has complied with its requisitions. The allegation that she was dispensed from complying with them by the plaintiff's counsel, is not sustained by evidence. That judgment is, therefore, affirmed, with costs.