No. 13,738.

## SUCCESSION OF DR. EDWARD B. BENTON.

### SYLLABUS.

1. Where the conduct of the husband justifies the wife in leaving him, and furnishes grounds for divorce, she is necessarily authorized to acquire a separate domicile, and the law of the domicile so acquired will determine her marital status. Hence, a judgment of divorce, rendered by a court of a State in which such domicile is acquired, and valid where rendered, is valid in other jurisdictions, without regard to the place of marriage, the offense, or the

Succession of Benton.

domicile of the husband, and the latter may be brought into court by publication, or otherwise, as provided by the *lex fori.*

2. It is settled jurisprudence in this State that a marriage will not be dissolved on grounds antedating the establishment here of the marital domicile, but it does not follow that this court will not recognize the validity of a divorce granted upon such grounds in another State.

3. In such a case, the decree of divorce is open to attack upon questions of jurisdiction, among which is good faith as to the acquisition of domicile. But where, in such decree, all necessary facts are found, it presents, upon its face, no intrinsic nullity, and will serve as a basis for a presumption of good faith with respect to a subsequent marriage.

4. A dative executrix should deposit the funds coming into her hands in a bank, established in the parish where such succession is opened, which pays interest on deposits, if there is such a bank, and if there is no such bank, she should deposit such funds in a solvent bank in such parish which pays no interest. And if she fails so to do, and fails to file annual accounts, and pays out such funds without authority of the court, for matters in which the succession is not concerned, she should be destituted of her office.

5. The fees and expenses of attorneys, and the expense of litigation between different heirs, or claimants, as to their respective rights, do not constitute general charges against the succession.

6. It being shown that an opponent had originally been employed by decedent as housekeeper, but that, in the course of time, there had ceased to be any question of wages between them, and that she and her children and grandchildren were, equally with the decedent, the beneficiaries of the home which he provided and which she made comfortable; and that the decedent further provided for them all in his will, a claim for years of back wages and for nursing during last illness was properly rejected.

7. It appearing in this case that there are conflicting claims with respect to the ownership of land which derives its principal value from the timber on it; that the probability is that it will be denuded of such timber if allowed to remain, or to go, into the possession of either of the claimants; that the judge *a quo* has ordered the judicial sequestration of such land, and has refused an application to bond the same, this court finds no reason for interfering with such ruling.

8. Nor, where a will has been probated, whereby the testator disposes of his entire estate, does this court discover any reason for reversing the ruling of the judge *a quo* in refusing to probate an alleged will of older date, which gives nothing which is not given in the will already probated.

### ON REHEARING.

1. A marriage only putative produces civil effects as relates to the party in good faith and his or her children. Smith vs. Smith, 43 A. 1148.

2. Without determining that the marriage is valid, it is entitled to weight in determining the good faith of the wife or of the husband.

3. After the second marriage had been contracted, apparently in good faith, those who have for years recognized its validity are scarcely in a position to be heard to have it decreed void, and the children of the marriage illegitimate and without the least rights.

4. The marriage as relates to the daughter is entitled to complete legal effect. As relates to the other parties concerned, the original opinion remains, as well as the decree.

A PPEAL from the Twenty-sixth Judicial District, Parish of St. Tammany.—*Thompson, J.*

*Stephen D. Ellis, Benjamin M. Miller* and *Benjamin Rice Forman,* for Instituted Heirs and Legatees, Plaintiffs, Appellants.

*Wickliffe & Falls, Stifft & Madison* and *T. M. Burns,* for Dative Testamentary Executrix, Defendant, Appellee.

On the application for rehearing by NICHOLLS, C. J.

On rehearing by BREAUX, J.

The opinion of the court was delivered by

MONROE, J. Edward B. Benton, a resident of the Parish of St. Tammany, died in New Orleans, June 4th, 1897, leaving real and personal property in said parish, and in the Parish of Orleans. Upon June 7th, following, his sister, Ella S. Benton, a resident of New York, presented to the District Court of St. Tammany an instrument, purporting to be her said brother's olographic last will, dated May 29th, 1897, whereby, after certain particular legacies, the testator gives "the remaining, disposable, portion" of his estate to his two sisters, Ella S. and Charlotte E. Benton, and names the former as his executrix, without bond. This instrument was duly proved and ordered to be recorded and executed, and the proponent took the required oath and received letters testamentary. Upon June 28th, a petition was presented to the court in the name of Mrs. Rachel Benton, in which it is alleged; that the petitioner resides in New Orleans; that she was married to the decedent, at Cairo, Illinois, August 11th, 1869, and lived with him, thereafter, in New Orleans, for many years, until he withdrew from the matrimonial domicile, and that said marriage was never dissolved; that she loaned him money, before, and placed in his hands property belonging to her, after, said marriage, and is a creditor of his succession with respect to the same in an amount exceeding $5,000.00; that the decedent left property in this State, acquired during said marriage, and which fell into the community superinduced thereby, and that she is entitled to be recognized as owner of one-half thereof; that he also left a daughter, issue of said marriage, now the wife of Jules F. Peytral, of New Orleans, and that the instru-

ment, purporting to be the will of said decedent, which has been admitted to probate, ignores the rights of petitioner, and of said daughter, and is, to that extent, null and void. She further alleges the illegality of the confirmation of Ella S. Benton as executrix, and avers that said executrix has failed to give bond and to cause an inventory to be made; that the property of the succession is worth over $40,000, and that, as a creditor, she has a right to demand a bond, and she prays for citation of the parties interested, and for judgment ordering the executrix to furnish bond and recognizing her as widow in community and as a creditor.

There was also filed upon the same day (June 26, 1897), a petition on behalf of Mrs. Peytral, in which it is alleged that the petitioner is the only child, and forced heir, of the decedent; that the instrument probated as his will is void for the reason that it was not "dated, written, and signed by the hand of said decedent, nor without assistance," and because he was *non compos mentis* at the date at which said instrument purports to have been executed, and was under the control of his sister, Ella Benton, and of one of the particular legatees.

It is further alleged that, in any event, the bequest to said particular legatee is void, for the reason that she was the concubine of the decedent, with whom he lived, whilst his wife, the mother of the petitioner, was, and is, living. She prays that the probate of the said alleged will, and the confirmation of the executrix, be annulled, and that said instrument be decreed to be of no effect; or, if that be denied, and said instrument be maintained as the will of said decedent, that the particular legacies therein be declared null; that said Ella Benton be removed, as executrix, and that petitioner be appointed in her stead; and that petitioner be also recognized as the sole heir of the decedent and sent into possession of his entire estate; or, in the alternative, that she be recognized as his forced heir, to the extent of two-thirds of said estate. And she further prays that an inventory be ordered. Upon this petition, the judge *a quo* made an order directing the executrix to give bond in the sum of $25,000, within thirty days, and to show cause, within a shorter time, why she should not be removed, for failure to cause an inventory to be made, or begun, as required by law. Thereafter, a petition was filed in the name of Mrs. Rachael Benton, which recites the order of court above mentioned and alleges that the executrix has failed to comply therewith, and that her

office is, therefore, *ipso facto* vacated, and the petitioner prays that an inventory be taken and that, after publication of her application, she be appointed dative testamentary executrix.

The inventory was accordingly taken, and, in due time, there being no opposition, the applicant took the oath, gave bond, and, upon September 24, 1897, received letters as dative testamentary executrix. In May, 1898, she filed a provisional account, which was opposed by two persons, claiming to be creditors, and, by the particular and universal legatees. The legatees also appeared, and, for answer to the petitions, filed on behalf of Mrs. Benton and Mrs. Peytral, deny the averments and charges therein made and insist upon the validity of the will.

In May, 1898, Mrs. Mary E. Monroe, claiming as creditor and particular legatee, presented a petition asking that the dative testamentary executrix be ordered to file a true statement of her accounts, together with her bank book, and, in default thereof, that she be dismissed from office, condemned, with her sureties, for all monies collected by her and not deposited and accounted for, and the executrix was, accordingly, ordered to file an account and to show cause why she should not be divested of her office. In February, 1899, another petition was filed, on behalf of said particular legatee and the two universal legatees, praying that said dative executrix be deprived of her office, condemned for certain monies alleged to have been received, and decreed to have no interest in the succession; and the two petitions thus mentioned were, in regular course, put at issue. In July, 1900, the dative executrix provoked the seizure by judicial sequestration, of certain property said to belong to the estate and to have been put in the possession of the particular legatee mentioned, who moved, without avail, to set aside, and to bond, said seizure. Thereafter, said particular legatee offered for probate an instrument purporting to be a will, made by the decedent in April, 1893, and the probate thereof was refused, on the grounds, that the will, of later date, already probated, disposed of the entire estate, and that it was useless to probate the other. From the issues as made up by those varied pleadings, it resulted that a number of judgments were rendered, four of which were to the following effect, to-wit:

1. A judgment rejecting the demand for the destitution of the executrix and praying that she be decreed to be without interest in the succession.

2. On the oppositions to the account.

3. Refusing to set aside, or release on bond, the judicial seques-
tration.

4. Refusing to probate the will of April, 1893.

These judgments have been brought up for review by means of an
appeal taken on behalf of the particular, and universal, legatees, and
they will be considered in the order in which they have been men-
tioned.

## I.

The appellants pray that the dative executrix be destituted of her
office and decreed to be without interest in this succession upon the
grounds, *inter alia,* that she obtained her appointment by falsely and
fraudulently representing herself to be the widow of the decedent,
when, in fact, she was never legally married to him. The evidence
shows that, in 1863, she was married, in Mississippi, to Burrill J.
Manscoe, and that she lived with him, in said State, except during
certain intervals of separation, until, probably, the year 1866, when
they came to New Orleans. Whether they came with the intention of
establishing a permanent domicil here is not altogether free from
doubt, but, as a matter of fact, after a separation, the duration of
which is not shown, they resumed their relations, as husband and
wife, in New Orleans, about the beginning of the year 1867, and
remained together until the middle of that year, when they separated
finally, and the next definite information we obtain as to the defend-
ant's whereabouts is from a petition for divorce, filed, in her name, in
June, 1869, in the Circuit Court of Knox county, Indiana. In said
petition, and in an amended petition, filed at a later date, she alleges
that she is a *bona fide* resident of said county, and has lived there for
more than a year; and she charges her husband with want of support,
drunkenness, brutality, and adultery, and prays for a judgment of
divorce. The defendant was summoned, by publication in a Knox
county newspaper, and, thereafter, upon the testimony of four or five
reputable witnesses, taken under commission in New Orleans, and
fully sustaining the charges contained in said petition, there was a
decree of divorce, which was entered upon what is called the "judg-
ment book," as of date August 12th, 1869. It is now claimed that said
judgment was really rendered upon August 10th, 1869, and that, by a
proceeding had, for the purposes of this litigation, in 1898, the date of
said judgment has been changed, *nunc pro tunc,* to that which it
should originally have borne. Be that as it may, upon August 11th,

1869, the defendant, as Rachael L. Davidson, which name the decree of divorce authorizes her to resume, was married at Cairo, Illinois, to E. B. Benton, whose estate is the subject of this controversy. The couple, shortly afterwards, came to New Orleans, where, with the exception of an interval spent at Bay St. Louis, Mississippi, they lived together for about nineteen years. During that time, there were three children born to them, viz: a boy and a girl, who died, and another girl, now Mrs. Rachael Peytral, one of the present litigants. There was never, at any time, the slightest question raised, or suggested, as to the validity of the divorce so obtained, or the marriage so entered into, or as to the legitimacy of the children born of said marriage. Benton introduced the defendant as his wife, and she was so recognized by every one in New Orleans who came in contact with them, and also, through correspondence, by his own family, including the universal legatees now before the court. In 1888, however, the decedent went to Honey Island, in St. Tammany Parish, where he engaged in saw-milling and other business. And if, from that time until the day of his death, he ever saw or communicated with his wife, the record fails to show it, as it also fails to show why he so acted. Nevertheless, for a number of years, he continued to write frequently and in terms of interest and affection to his daughter. But she married upon April 3rd, 1895, and never saw him afterwards, nor does it appear that she ever heard from him after he was informed of her marriage. His sister, Ella S. Benton, and the particular legatee, Mrs. Mary E. Monroe, were with him during his last illness and they sent word to the daughter, who called to see her father, that he could not be seen. And when he died they failed to notify her, so that her first intimation of the event came through a notice in a newspaper, several days after he was buried.

There is no evidence in the record (save the finding in the decree of divorce to the effect that all the facts necessary to the obtention of that decree had been established) as to the plaintiff's *bona fide* residence in the State of Indiana. Upon the other hand, there is no evidence sufficient to overcome the *prima facie* effect to which that finding is entitled. The most that can be said concerning such evidence being that it raises a suspicion that the *animus manendi* may have been wanting. In view, therefore, of a ruling heretofore made upon this point, whilst we should hesitate to maintain the validity of the divorce so obtained without further proof of the good faith of the

plaintiff (defendant here) in the matter of the acquisition of domicil in Indiana, we are, nevertheless, of the opinion that the decree in question discloses, upon its face, no intrinsic nullity, and is "subject to attack only upon proof of extrinsic facts undermining the jurisdiction." Smith vs. Smith, 43 Ann. 1140. Under the circumstances, however, we prefer to pretermit, as did the learned judge *a quo,* any decision as to the validity of such decree, and to proceed to the inquiry whether the said plaintiff (defendant here) can be held to have believed in good faith, that she was at liberty to marry again. It has already. been shown that for nineteen years, from 1867, when the marriage was celebrated at Cairo, until 1888, when the decedent left the defendant and went to Honey Island, E. B. Benton and the defendant lived together as husband and wife, and that during that time the validity of the divorce which the defendant had obtained, and of the marriage which she had thus contracted, was never impugned. To this it may be added that, even after Benton left the matrimonial domicil, and up to the date of his death, in June, 1897, he never repudiated said marriage, and that during the greater part of that time, he continually recognized his daughter, issue of that marriage, and wrote to her of her mother, and that, in his last will, written only a few days before his death, he plainly recognized his daughter's rights, and, impliedly, those of the mother, by the words "the remaining *disposable* portion" used in bequeathing the *residuum* of his estate to the universal legatees. And it may be further remarked, in this connection, that the plaintiffs herein insist that for thirteen years of the time during which the defendant herein and the decedent lived together, in and about New Orleans, the divorced husband, Manscoe, was also in and about here, and that it has not been suggested that he any more than any one else questioned the status of the defendant as the lawful wife of E. B. Benton. It is proper to bear in mind, also, for the purpose of the present inquiry, that the finding of the decree by which the divorce from said Manscoe is claimed to have been affected—that the plaintiff in the suit had resided for a year in Indiana—is entirely uncontradicted. In fact, it is not suggested, even in argument that she did not, as a matter of fact, reside there during that time prior to the obtention of the decree, and it would be hard to believe that, having done so, and having obtained said decree, she still believed herself to be the wife of Manscoe, and, so believing, united herself to Benton. Viewed in

the light of her conduct throughout, we therefore conclude that the defendant was sincere in the belief that she was a lawfully divorced. and lawfully married woman. And, viewing the matter in its legal aspect, and inquiring why she should have entertained such belief, we find that, if she had been reasonably well informed as to the law and jurisprudence of the country upon a somewhat difficult subject, she would have known that it is the universally recognized exception to the general rule (which determines the domicil of the wife by that of the husband) that, where the conduct of the husband furnishes grounds for divorce, and justifies the wife in leaving him, she is necessarily authorized to acquire a different domicil; that the law of the domicil controls the marital status; that a judgment rendered by a court in one of the States of the Union, having jurisdiction of the parties and of the subject matter, and valid where rendered, is valid in the other States, and in the courts of the United States; that in most of the States it is held that a proceeding for divorce may be instituted by the wife at her domicil, and that, in such cases, the place of the marriage, of the offense, and of the domicil of the husband, are of no consequence; and that the husband may be brought into court by publication or otherwise, as the law of such domicil may direct. Cheever vs. Wilson, 9 Wal. 108; Bishop on Marriage and Divorce (6 Ed.), Vol. 11, Sections 128, 155 *et seq.* It may properly be said that she would also have known that it is established jurisprudence in this State that a marriage contracted elsewhere will not be dissolved on grounds antedating the establishment of the marital domicil here. But she could not have been expected to have assumed that, because the courts of Louisiana do not recognize certain grounds as sufficient to justify decrees of divorce, in cases presented to them, they will therefore decline to recognize the validity of divorces granted upon such grounds in other States, where jurisdiction *ratione materiae et personae* have been acquired. As to the discrepancy between the date of the divorce, as shown by the original transcript of the record, and the date of the marriage, the testimony of the counsel for the defendant, who examined the judge's docket of original entries, and the "judgment book" in which the decree was afterwards entered, is clear to the effect that the judgment of divorce was actually rendered upon August 10, 1867, and we consider the matter of the correction of the record as immaterial for the purposes of the present question, since if the plaintiff (defendant here) was present when the judgment

was rendered, she might very well have believed that she was a divorced woman from that time.

As to the suggestion that the marriage was null, because entered into within ten months after the divorce, by reason of the provisions of the Code, Article 137. If it be assumed that the article in question is applicable to the defendant, and to the marriage contracted by her, in Illinois, we are, nevertheless, of the opinion that said article is not framed in such terms of prohibition, especially when considered in connection with Articles 115 and 960 of the Code, as to justify the conclusion that a marriage entered into in contravention of its provisions is stricken with nullity. Our conclusion upon this branch of the case, then, is, that the defendant believed, and had reasonable grounds for believing, that she was a lawfully divorced, and a lawfully married woman, and that she, and her daughter born of such marriage, are entitled to the benefit of the civil effects resulting therefrom. C. C. 117, 118; 1 Marcade 522; 1 Baudry Lacantinerie 329; Patton vs. Cities, etc., 1 Ann. 98; Succession of Navarro, 24 Ann. 298; Blasini vs. Succession of Blasini, 30 Ann. 1388; McCaffery vs. Benson, 40 Ann. 10; Smith vs. Smith, 40 Ann. 1140; Jerman vs. Tenneas. 44 Ann. 620; Bothick vs. Bothick, 45 Ann. 1382; Succession of Hernandez, 46 Ann. 962.

The plaintiffs allege that the defendant failed to furnish a sufficient bond, with solvent sureties; that she failed to deposit the funds of the succession in a bank in the parish, paying interest on deposits; that she has failed to file annual accounts; and that she has paid out the money of the succession without authority. These charges are all substantiated except the first, with regard to which, it appears that the amount of the bond furnished by the defendant was fixed by the court, and is ample, and that new sureties were furnished when ordered to replace those who died or were doubtful. As to the failure of the defendant to file an annual account, it is not, of itself, sufficient cause to justify destitution, unless such failure continues after demand and order for an account. But the failure of the defendant in this regard acquires a cumulative effect. when considered in connection with the more serious charges, which are fully established. Our learned brother of the District Court held, upon the authority of Succession of Peytavin, 7 R. 477, that the defendant was excused for the failure to deposit the funds of the succession in a bank, in the parish, paying interest on deposits, by reason of the fact that there

was no such bank in the Parish of St. Tammany. The evidence shows that there is a bank, recently established, in the parish, and whilst it has not, as yet, paid interest upon any deposit, it is not conclusively shown that it would not do so. In any event, it was the duty of the defendant to have deposited in such bank the money received by her as executrix, as the decision in the case relied on must be considered as having been overruled by the decision in "Succession of Christy," 6 Ann. 427, in which it was said: "But the greatest object of the law was to insure the safety of the funds by their deposit in bank. That is the essential requirement of the law. The deposit in an interest paying bank is but an incidental requisition of the law." It may be said that the executrix should be excused in this respect because she deposited in a bank in New Orleans, and this argument would be entitled to serious consideration if she had complied with the other requirements of the law by which her duties are defined, though it does not appear that the bank in which her deposits were actually made pays any interest thereon, and we hold it to have been her duty to have deposited the money coming into her hands in a bank within the territorial jurisdiction of the court by which she was appointed, if there was such a bank to be found. And so, although the law requires an executrix to file her accounts annually, her failure to do so may not require her dismissal from office where she files her account when demanded, or when the demand for such dismissal is not made until such delayed account is filed. Succession of Head, 28 Ann. 800; Congregation vs. Farrally, 34 Ann. 533. But to these omissions, we have, in the instant case, the additional, established, charge, that the executrix has paid out the funds of the succession under her administration without authority and in connection with matters with which that succession has no concern. She appears to have been authorized by means of a motion, which was approved by the, then, presiding judge, December 28, 1897, but which was not filed until July 13, 1900, to pay $450 to her counsel and $365 to herself, as money "by her expended in opening said succession and obtaining evidence therein." This authorization is distinctly open to criticism in that it fails to specify the purposes for which the payments so authorized were to be made, and we are at a loss to understand why it should have been withheld from the files of the court for nearly three years. But, even by the most liberal construction, it does not acquit the defendant of the charge that she has paid out money of the succession

without authority, since the vouchers filed by her show that she has paid $1,061.05, or $246.05 more than the motion calls for. It is true that there are a few cases in which demands for the destitution of executors, for making payments without authority, have been denied, where they have satisfactorily shown that such payments were made in discharge of debts justly due by the successions administered by them. Succession of Dickson vs. Succession of Dickson, 23 Ann. 583; Congregation vs. Farrelly, 34 Ann. 533; Succession of Sparrow, 39 Ann. 704. Upon the other hand, in Reed vs. Crocker, 12 Ann. 445, an exec· utor was held liable for the penalty imposed by the Act of 1837 (now C. C. 1150) for *withdrawing funds from bank without authority,* irrespective, apparently, of the disposition made of such funds, and, in Succession of Boutte, 32 Ann. 556, the sureties of the executors wer⁻ released, upon their demand to that effect, because said execulors had failed "to deposit all moneys of the estate in bank," and because they had paid out money without an order of court, although such payment had been made in discharge of privileged claims, such as funeral expenses, law charges, etc. This court said that in that case, through Mr. Justice Fenner, after referring to C. C. 1150, executors and curators, where their violations of these provisions have been merely technical, such as the payment of debts found to be really privileged, and reasonable in amount, though without order, may plead equity against the enforcement of the penalties of twenty per cent. damages and dismissal from office, but the right of the surety to require a termination of his liability and the substitution of a·new bond is rather a privilege to the surety than a penalty on the executor," etc. We have been referred to no case, however, in which an executor has been excused where it has been shown that he has paid out the money entrusted to him without an order of court, in satisfaction of claims for which the succession administered by him was not liable.

We therefore conclude, in view of the several irregularities which have characterized the administration of the defendant, that some other person should be placed in charge of this succession.

## II.

Considering the opposition to the accounts, we find that the executrix had received, prior to the date at which said account was prepared, $1375, and that she had charged herself with $1175. She should be required to debit her account with $250 additional. The proposition

that as widow in community of the decedent she has a right to appropriate to herself one-half of the revenues or property of the succession, whilst it is still under administration, and that the opponents are estopped from insisting upon her accounting for what she has actually received in her capacity of dative executrix, because they have here, or elsewhere, alleged that the property, of which such receipts are the revenues, does not belong to the succession, are equally untenable. The widow in community can take nothing save her interest in the *residuum* after the community has been administered and its debts paid. And as to the other proposition, its enough, for the present, that the executrix actually collected certain moneys for account of the succession, and that the opponents are testamentary heirs. If there is any estoppel in the matter it is double, and she should be first estopped to set up the plea, as against a demand for an accounting for moneys so received. The suggestion, in the brief, that this court should decree that the executrix, who had charged herself with $1125, as collected for account of the succession, and who is before the court only as an appellee, and who has not even filed an answer to the appeal, should be credited back with one-half of the amount so charged, upon the ground that, to that extent, the charge is erroneous (she being entitled to retain it as widow in community), can hardly be seriously intended.

Considering the items on the credit side of the account:

*Items 1 and 2,* amounting to $150, it is admitted, were properly disallowed.

*Item 3*—$225. The credit in connection with this item is $223.60, which, it is said, was paid to redeem the Honey Island property. The evidence upon the subject is not in the record before us, and the question of the correctness of the credit must rest in abeyance until the issues presented in the record No. 13,739 are determined.

*Item 4*—$175, for taxes, interest, etc., on the Honey Island property. We find no evidence in the record concerning this item, but will reserve the rights of the defendant with respect thereto.

Items 5—$6; 6—$47; 15—$6; 16, 17, 18, 19, 20, 21, amounting to $72; 25—$19.35; 26—$19.35; 27—$2; 28—$10; 29—$25, being costs and charges disbursed by the defendant, from the funds of the succession, in connection with her efforts to establish the validity of her divorce from Manscoe and her subsequent marriage to E. B. Benton, have no proper place upon her account as general charges against the succession.

Item 9—$450, "To John C. Wickliffe, attorney for Mrs. Rachael Peytral, legal heir of the succession."

This item also falls within the ruling applied to the items last above mentioned. Succession of Gourjon, 10 R. 541; Succession of Hasley, 27 Ann. 586; Succession of Hughes, 14 Ann. 863; Succession of Florence, 36 Ann. 304.

Items 7 and 14—$100 and $20, respectively, costs of court on account. These items are sustained by the evidence and are admitted.

Item 8—$450, "On account attorney's fees to Stifft & Madison, for succession." There is some confusion as to what is meant by the items of attorney's fees which appear on the account, it being claimed by the counsel representing the defendants, Mrs. Benton and Mrs. Peytral, in the brief filed by them, that the item No. 9, to John C. Wickliffe, attorney for Mrs. Rachael F. Peytral, legal heir of the succession, does not represent a claim for attorney's fees due by Mrs. Peytral, but by the succession, and therefrom arises the confusion. If the item in question is not intended to represent the claim of Mrs. Peytral's attorney, why does the language used express that idea, and no other?

The learned judge *a quo* relegated both of these questions to a future account, saying: "Items eight and nine, attorney's fees, must be placed in a new account, and the services specified so that the court can decide what service was rendered on behalf of the estate." We have concluded, however, that item 9 has, by its terms, nothing to do with the estate, and we have rejected it for that reason. Upon the other hand, item 8 is, by its terms, a charge for services rendered to the estate, and we are of opinion that there is sufficient evidence to justify us in allowing it. We agree with the judge *a quo,* however, that the necessity for the expenditures for telegrams and trips to Amite and Covington is not made sufficiently apparent.

The particular legatee ,Mrs. Mary E. Monroe, asks to be recognized as a creditor, partly privileged and partly ordinary, first, for $1605, for services as housekeeper, from July 23, 1888, to June 4th, 1897, at $15 per month, and, secondly, for $1,395 for services as nurse during the last illness of the deceased. There is not the least evidence in the record to sustain the charge made by Mrs. Peytral and her husband with regard to the relations which subsisted between this opponent and the decedent. Upon the contrary, it is shown, without contradiction, that the opponent is a woman of good character, who, whilst in charge, as housekeeper, of the decedent's establishment, has lived there, sur-

rounded by her grown children and, more recently, grandchildren. And it is a significant fact, that, during that time, the house was visited by the decedent's sister, who lived with him for a while, and who, with other reputable witnesses, gives to the opponent her unqualified approval. But the relations between the opponent and the decedent, unobjectionable though they were, ceased, at an early date, to be those of master and servant in the ordinary acceptation of the term. She and her children lived at Benton's house and made it a home for him, and he provided for them and appears to have given employment in his mill to those of them who were able to work there. When he met with accidents, as he did on one or two occasions, or fell sick, he was nursed back to health and strength and showed his gratitude by some extra liberality, but the evidence does not justify the belief that there was any question of wages between him and the opponent for a long time before his death. And it was because of that fact that he made the opponent his particular legatee and left her $5,000 and the house in which she lives. Under these circumstances the claim which she sets up for wages should not be allowed.

## III.

In support of his judgment upon the application to bond the sequestration, the judge *a quo* says: "Up to the time of Dr. Benton's death, he retained possession and control of this property, though his sister, who lived with him, claimed under a tax title. Mrs. Monroe was on the property, as his housekeeper. After Benton's death, the sister, who had the tax title, sought to administer the property under the will of the deceased constituting her a legatee and testamentary executrix. She claims that she redeemed the property sold at tax sale * * *. After the alleged redemption, Miss Benton gave Mrs. Monroe a quit claim deed to the property, without warranty. The widow of Benton claims to own one-half of the property, as belonging to the community, but the legality of her marriage is disputed by Mrs. Monroe and the Bentons. The daughter of Benton disputes the validity of the will and claims the estate as a forced heir. Her legitimacy is contested by the Bentons. It also appears that the property is under seizure by a mortgage creditor. Thus, we have the following parties claiming the property: Benton's sister claiming, under the will, and as legal heirs; Mrs. Mary E. Monroe, claiming under tax title; Mrs. Benton claiming as widow in community; the daughter claiming as forced heir, a mort-

gage creditor claiming under executory process. The property has on it two saw mills and a railroad. The parties running the mill are extending a private road in order to enable them to haul the timber more rapidly. It requires no testimony to convince me that if this tract of land is turned over to the party applying for permission to bond, there will be very little to litigate about by the time of the final decision of this suit. It would be unjust to allow Mrs. Monroe to bond the property, even if the bond could be made to cover all possible damages, because, if the property is not hers, it is unjust to compel the true owners to practically sell her the timber, which is yearly increasing in value. As well might a trespasser claim the right to bond an injunction against his depredations. The timber constitutes the principal value of the estate. It would be an almost impossible task to ascertain the value of the timber cut from a tract of over 13,999 acres. For these reasons, the application to bond is refused."

These reasons, we think, are amply sufficient to sustain the conclusion reached. Aside from which, the question of the ownership of this property is now pending in another suit, which is soon to be decided in this court, and no good purpose could be subserved by changing the *status quo* in the meanwhile. C. P. 273. 274. Schwan vs. Schwan, 52 Ann. 1183.

## IV.

In the matter of the refusal of the judge *a quo* to admit to probate the alleged will of April, 1893, we find no sufficient reason for making any change in the judgment. The instrument offered for probate gives nothing to anyone which is not given by the later will, which has been probated, and which disposes of the entire estate of the testator.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court, of date September 4th, 1900, rejecting the demand of Misses Ella S. and Charlotte E. Benton, universal legatees, and of Mrs. Mary E. Monroe, particular legatee, for the destitution and removal from office of Mrs. Rachael L. Benton, dative testamentary executrix of Edward B. Benton, deceased, be annulled, avoided, and reversed, and that there now be judgment in favor of said parties first named, and against said Rachael L. Benton, destituting her of, and dismissing her from, said office of dative testamentary executrix. It is further ordered, adjudged and decreed, that the judgment of said court, of date August 27th, 1900, upon the oppositions of Misses Ella

'S. and Charlotte E. Benton, and of the said Mrs. Mary E. Monroe, to the account filed by said Mrs. Rachael L. Benton, dative testamentary executrix, be reversed, and affirmed, in the following particulars, respectively, to-wit:

In so far as said judgment approves and allows the items 3 and 4 of said account, and rejects, as in case of non-suit, the two items of $450, each, for attorney's fees, that said judgment be annulled, avoided and reversed, and that there now be judgment rejecting said items 3 and 4, as in case of non-suit; approving and allowing item No. 8, being an item of $450, attorneys fees to Stifft & Madison; and rejecting the item of $450, attorneys fees to "J. C. Wickliffe, attorney for Mrs. Rachael F. Peytral, legal heir of the succession." It is further ordered, adjudged and decreed that, in all other respects, said judgment be affirmed. It is further ordered, adjudged and decreed, that the judgment herein rendered, of date August 8th, 1900, denying the application of Mrs. Mary E. Monroe to release on bond the judicial sequestration of the Honey Island property be and the same is hereby affirmed. It is further ordered, adjudged and decreed, that the judgment of said District Court, of date July 12, 1900, refusing the application of Mrs. Mary E. Monroe for the probate of the alleged will of April —, 1893, be and the same is hereby affirmed. It is further ordered, adjudged and decreed, that the costs in both courts be borne by the succession.

PROVOSTY, J., takes no part.

## ON THE APPLICATION FOR REHEARING.

NICHOLLS, C. J. An application for rehearing has been made on behalf of Misses Charlotte Benton and Ella Benton and Mary Monroe, to which has been annexed certain documentary evidence bearing upon the question of the *bona fides* of the dative executrix, Mrs. Rachael L. Benton, in the matter of the obtaining of her divorce from Burrell, J Manscoe, together with affidavits going to show that this evidence has been newly discovered. Without expressing any opinion as to what may be the further action of the court in the premises, we are of opinion that the application, as thus made, justifies the re-opening of the case *quoad* the particular questions hereinabove referred to, and matters incidentally connected therewith and to be affected thereby.

It is, therefore, ordered, that the rehearing as prayed for by the parties above named be granted. And it is further ordered that the rehearing, as applied for by the dative executrix, be denied.

## ON REHEARING.

BREAUX, J. The dative testamentary executrix has been destituted. The judgment is final both as to the destitution and the writ of sequestration which was issued in the case and which is to remain for the time being undisturbed. It is also final in matter of the opposition to the account filed and approved.

This court granted a rehearing in matter of the good faith of Mrs. Rachael Benton and upon questions incidental to that issue.

The case having been argued on the rehearing, further consideration was given to the issues.

It was not deemed advisable, in order that the issues may be tried before the District Court, to recall and set aside the judgment (decreeing that Mrs. Benton was in good faith) of this court and of the District Court, and let the case be remanded to try this issue and to determine again the effect to be given to the proceedings for divorce and to the judgment rendered between Mrs. Benton and Burrell J. Manscoe in Indiana. Mrs. Peytral, daughter of E. B. Benton and Mrs. Rachael Benton, is also a party to this litigation. She sued to destitute the executrix, and to annul the will, and claim the succession. She asked to be recognized as Dr. Benton's sole and only heir.

On the trial of the case, her evidence was heard. It was made manifest that the late Dr. Benton always treated her as his daughter. After having left the matrimonial home to reside in another parish of this State, it was to her always that he wrote. His letters to his daughter are advisory and kind. He admonished her to keep good company or none; says to her that he is pleased with her letters; that her mind is improving, and that good books are excellent companions; says to her that she is near and dear to him. At all times he seeks to protect and shield her. All his letters contain a number of expressions to that end. The family of Dr. Benton have always considered her as one of its members. In letters, the mother of Dr. Benton refers to this daughter when she was a child as "Baby Rachael."

Whatever errors the mother may have committed, and however void the decree of divorce obtained in Indiana may have been, it would be a sad necessity if ever it becomes necessary, under the law, to decide that this daughter must be considered an outcast from all family ties and be numbered as one among the disinherited of humanity. She, until recently, as we understand, had no cause to suspect that she was not the daughter of a legal marriage.

It is true that in the last few years prior to his death the father, who it seems was an eccentric man, became estranged from his daughter. He was, it appears, opposed to her marriage and her husband was not in favor with him, but in all this he was never heard to disown her. During his last illness, the daughter called to see him. She failed in getting admission to his room, but not owing to any fault of hers. She was not at his funeral, it is true, but no one gave her notice of his death, upon whom it devolved to give the notice.

The mother of Dr. Benton, and the other members of her family, while he lived, always looked upon him, so far as the record discloses, as the husband of Mrs. Benton and the father of Rachael. The letters addressed to them by Mrs. Benton, mother of Dr. Benton, lead to the inference that they considered her as united in lawful wedlock.

There remain two sisters and a brother of the late Dr. Benton. The sisters are the claimants. The brother has not sought to have the decree of divorce declared void, or to attack the will. The plea of the sisters to have the marriage of their brother decreed void and the child illegitimate is not persuasive.

The license in due form is produced and evidence of the marriage which took place in Cairo, Illinois. This was preceded by a decree of divorce.

As relates to the daughter, we are thoroughly convinced that the marriage must be given complete legal effect. As relates to the father and mother, we are of the opinion that it falls within the principles laid down in Smith vs. Smith, 43 Ann. 1148.

As relates to Mrs. Benton, and *particularly to the late Dr. Benton,* we are not prepared to hold that plaintiff had made out such a case as requires us to decree that the marriage was not at least a putative marriage.

The good faith of the parties sufficient to give it effect as such has not been rebutted to an extent that would justify us in recalling the views heretofore expressed by us, and in setting aside our original decree.

Our order granting the rehearing is rescinded and recalled.

Our former decree is reinstated and is the decree of the court.

MR. JUSTICE BLANCHARD, dissents.