William H. McClendon and William Winans Wall, for applicants. Clay Elliott, for respondent.

NICHOLLS, C. J. There is one feature of this case which plaintiff's counsel refer to. It is claimed that the property has been in the actual possession since 1888 of one or more of the heirs of Sharkey, and that, the property being held in indivision for the whole tract of 963 acres, the possession of any of the heirs upon any part of that tract was a possession of the whole, and this possession was the joint possession of all the joint owners. The fact that one of the heirs has been in possession is not as clearly shown as it should be. The question of the possession of the property at the time, and antecedently to the institution of these proceedings, is an important fact in this case, and should be positively shown. We think justice requires that the case should be remanded, and a new trial had especially upon this fact of possession.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgments of the district court and of the Court of Appeal rendered herein be, and the same are, annulled, avoided, and reversed, and this case be reinstated on the docket of the Twenty-Fifth judicial district court for the parish of Tangipahoa, and it is hereby remanded to said district court for a new trial and further proceedings according to law.

---

(35 South. 801.)

No. 14,724.

In re DIMMICK'S ESTATE et al.

(Dec. 14, 1903.)

CAUSE OF ACTION — SPLITTING — ADMINISTRATOR—PROOF OF CLAIM—BREACH OF DUTY—PENALTIES.

1. Article 156 of the Code of Practice, by which a litigant who demands less than is due him is held to have abandoned the overplus, does not compel a litigant to include in his suit all the moneyed demands he has against his debtor, under penalty of being held to have abandoned those not included. It only forbids the dividing of one debt for separate suits.

2. An administrator or executor is held to strict proof of his claims against the succession he administers.

3. For the enforcement of Act 13 of 1837, now sections 9 and 1465 of the Revised Statutes, and article 1150, Civ. Code, denouncing penalties against administrators and executors for failing to file an account every 12 months, or to deposit the money of the succession in one of the chartered banks of the state, or for withdrawing the funds of the succession from bank without an order of court, it is not required that the succession shall have suffered loss. The statute must be enforced strictly, though cases may arise manifestly not coming within its intendment, and to which, therefore, it would not apply.

4. But where an executor has been derelict in all these respects (that is, has failed to file an account, and has deposited only part of the funds, and has withdrawn without order of court the funds deposited), there cannot be imposed upon him a separate penalty for each dereliction, or, in other words, he cannot be condemned to pay 10 per cent. plus 20 per cent., plus 20 per cent. per annum interest, but, the penalty being in the nature of running interest, only one interest can run, and therefore only one of the penalties can be imposed.

5. The statute having been enacted in the interest of creditors and heirs, these may waive its benefits; and therefore the 20 per cent. penalty does not accrue on that part of the funds of the succession belonging to the executor, or controlled by him as tutor, or belonging to those of the heirs who have consented to his acts.

6. In the distribution of the funds of the succession, the sum accruing from the penalties must go to the heirs on whose share it has accrued.

7. The penalty can be imposed only in connection with funds actually received by the executor. It cannot be imposed on the amount of a debt due by the executor individually to himself officially, which, while presumably paid at maturity, yet is not shown to have been actually paid.

(Syllabus by the Court.)

Appeal from Eleventh Judicial District Court, Parish of St. Landry; Edward Taylor Lewis, Judge.

In the matter of the estate of Addison Dimmick and Levisa Carpenter. Frank Pulford, as tutor of one of the heirs, filed an opposition. From the judgment, the administrator appeals. Modified.

Kenneth Baillio, for appellant. Lewis & Lewis, for appellee.

PROVOSTY, J. Frank Dimmick, testamentary executor of his father, Addison Dimmick, deceased, and administrator of the succession of his mother, Levisa Car-

penter, having filed the account of his administration, Frank Pulford, as tutor of one of the heirs, his minor child, grandson of the de cujus, filed an opposition.

We take up in regular order, and dispose of, the grounds of opposition:

First, that in accounting for the proceeds of the crop of 1899 on the Bellevue Plantation the accountant has improperly deducted $479 for alleged expenses paid out of his own moneys in making the crop. It is asserted that this claim is manufactured out of whole cloth, and that, even if just, the administrator is debarred from now urging it, because the proper time to have urged it was in the defense of a certain suit heretofore litigated between the opponent and the accountant individually; that the judgment in said suit is res judicata of the said claim, or, at any rate, that, not having urged the claim in said suit, the accountant must be held to have abandoned it, under article 156 of the Code of Practice, providing that "if one demand less than is due him, and do not amend his petition in order to augment his demand, he shall lose the overplus."

The certain suit here in question was a suit brought by the present opponent against the accountant individually after the death of Addison Dimmick to set aside a transfer made by the deceased, Addison Dimmick, to the accountant, of one-fourth undivided of the same Bellevue Plantation whereon was made the crop of 1899, the proceeds of which are being accounted for and litigated. The transfer thus sought to be annulled purported to have been made in satisfaction of services rendered by the accountant to the deceased, Addison Dimmick, from July, 1886, to the date of the transfer. But no sum was named in the act of transfer as being the value of the services, or the amount due for them, and that was made the ground of the attack. It was said that as a sale or as a dation en paiement the transfer was null for want of a fixed price. The transfer had been made in February, 1898, and from that time the cultivation of Bellevue Plantation had been for the joint account of the accountant and his father, and at their joint expense, in the proportion of one-fourth to the accountant and three-fourths to his father. The date of the death

of the father was December, 1899; the date of the filing of the suit was April, 1900; the date of the filing of the answer to the suit was October, 1900. In this answer defendant prayed that, in case the transfer was set aside, he should have judgment for the services which formed its consideration. He could have included in the same answer a demand for this $479 now in question, but he did not do so; and the contention of opponent is that the judgment in the suit is res judicata of the demand, nevertheless, or, at any rate, that the time to make the demand was then, and that, not having made it then, accountant must be held to have abandoned it, and is now estopped from urging it.

We do not see how the demand can be res judicata when it has never been presented to any court, and still less been passed on by any court. Nor do we see why the accountant was bound, under penalty of abandonment, to urge the demand in that suit. It grew out of the making of the crop, and could well be deferred for settlement until the time came to account for the proceeds of the crop. In fact, the accountant was not even bound to demand in that suit the restitution of the consideration of the transfer. Long ago it was held that a defendant in a petitory action is not bound to urge his claim for useful improvements by way of reconventional demand, but may await the termination of the petitory action, and then bring a separate suit. Gracie v. Gayoso, 7 Mart. (N. S.) 650. Nor did his urging the demand for his services impose upon him the obligation of also urging at the same time the demand for these expenses. The two demands were distinct and separate. A plaintiff is not compelled to include in his suit all the demands he may have against the defendant. It is expressly provided in the Code that he may do so (article 148), but it is nowhere provided that he must do so. Surely no one will contend that a plaintiff is bound to include in his petition all the debts the defendant may owe him, under the penalty of being held to have abandoned and remitted those he has not included. If he holds several mortgage notes he may foreclose on them separately. Townsend v. Payne, 42 La. Ann. 909, 8 South. 626.

The cases cited by opponent's learned counsel were decided on their peculiar facts, as the following examination of them shows:

In the case of McCaleb v. Fluker, 14 La. Ann. 316, a judgment had been obtained on a mortgage claim, and the judgment had been paid in full, and a receipt given accordingly; and then, after all this, suit was brought to recover attorney's fees, because the act of mortgage stipulated that the mortgagor should pay any costs that might be incurred in collecting the debt. The defense was that the act of mortgage did not stipulate the payment of attorney's fees, and that the payment had been received in full satisfaction. The court held that, even on the supposition that the debt previously existed, the debt had merged in the judgment, and the defendant had been released by the terms of the receipt and the consent given. Here was but one debt, with accessories. Evidently it is no more permissible to separate the accessories from the principal for separate suit than it is permissible to divide the principal itself. But in the instant case the two demands were distinct and separate.

In Stafford v. Stafford, 25 La. Ann. 223, a wife sued her husband in separation of property, and in restitution of her paraphernal funds, which she alleged were in danger of being lost, owing to the embarrassed condition of . her husband's affairs, and she obtained judgment. Afterwards, for the transparent purpose of enabling her husband to shield his property from his creditors, she brought another suit for another and very much larger amount of alleged paraphernal funds, which, if due at all, had been due at the time of the first suit. Said the court: "The fairness and genuineness of the claim is doubtful. No explanation whatever is tendered of so anomalous and unusual a proceeding as suing for only part of her demand, when the whole was due, and, according to the allegations, was in danger of being lost. After a full consideration of the case, we conclude that she ought not to recover." Citing article 156, Code Prac., and the 14 La. Ann. case, supra.

The case must be admitted to be a . peculiar one. We are not advised whether the husband owed the wife two debts, or only one. If the latter, there was a clear case of dividing a debt and bringing two suits, and article 156, Code Prac., came into full play. If the former—that is to say, if the debts were distinct and separate causes of action—the decision can be justified only on the supposition that there is in the wife's suit for separation of property something peculiar, whereby the wife must either urge none of her moneyed demands, or else include them all, under penalty of losing those not included. In either event the case has no analogy with the one in hand, for in the instant case there were clearly two distinct, separate causes of action, and the accountant is a mere ordinary litigant, not bound to include in his suit all the demands he happens to have against his adversary.

In Payne v. Anderson, 35 La. Ann. 977, it was urged that the judgment had been extinguished by payment, and a number of payments were specially pleaded. The court reduced the judgment by the amount of the payments specially pleaded and proved, but refused to reserve to the litigant the right to show thereafter that further payments had been made. Of course not. There must be an end to litigation. It is no more permissible to attack a judgment piecemeal than it is to divide a debt for separate suits.

We do not think the accountant was precluded from claiming this deduction, but, when we come to consider the claim on its merits, we are not favorably impressed with it. It depends for support upon the testimony of the accountant, and that testimony, while positive as to the sum total, is vague as to detail, and is not sought to be corroborated on many points where it seems to us corroborative evidence must have been available if the claim had been well founded in fact. Also the testimony is accompanied by the statement that the book in which the account was kept has been lost, and such loss of books is always a suspicious circumstance. In the former case—that involving the validity of the transfer—this court had occasion to point out how this witness had changed his testimony to fit his case. In the present case he testifies that a settlement had taken place on the 1st of June between him and his father, when in the former case he testified that no settlement had taken place. He explains the discrepancy, but the explanation

is not very satisfactory. Everything considered, we do not feel justified in allowing the claim. Strict proof is required of an administrator against the succession he administers. Succession of Lee, 4 La. Ann. 579; Hennen's Digest, p. 1514, §§ 1, 2.

The next opposition is to an item of $141.66 for commissions of administrator in the succession of Levisa Carpenter. The succession of Levisa Carpenter had no property outside of its interest in the community property that was being, and necessarily had to be, administered upon in the estate of her husband, and it had no debts. An administrator was entirely unnecessary. Whether this claim could not be denied because the expense was entirely unnecessary (Succession of Boyd, 12 La. Ann. 611), need not be decided. The decision can be made to rest upon the facts, and we prefer so to rest it. The preponderance of the evidence shows that, when the accountant applied for the administration of the succession of Levisa Carpenter, the present opponent was about to oppose the application, when an understanding was arrived at, according to which the accountant was not to charge any commission in the succession of Levisa Carpenter. This was a valid agreement, and is binding on the opponent.

The next ground of opposition relates to the crop of 1900. It is not pressed before us, hence it need not be further noticed. Some corrections were made in the account by consent, and they, in turn, call for no attention on our part.

The remaining grounds of opposition had better be considered together. They are stated in the petition as follows:

"(1) Opponent shows that said Frank Dimmick has rendered himself liable to the heirs and legal representatives of said estate for interest at the rate of 10 per cent. annually from December 20, 1900, up to the date of filing said account, on $15,000, the amount for which said Frank Dimmick was accountable at said date; said interest being due by him for failure to render an account of administration as provided by section 4, Act 90, approved and signed March 12, 1855, and also as provided by other provisions of our statutory law.

"(2) Opponent shows further that the said Frank Dimmick has incurred liability to the estate administered by him of 20 per cent. annual interest on $1,005.60 from December 15, 1899, that being the portion of the cotton crop of 1899 retained by him and not distributed to heirs; on $2,222.45 from February 8, 1900, that being amount cash proceeds of sale of that date; on $5,683.33 from November 28, 1900, cash payment on sale of plantation; on $5,683.33 from November 28, 1901, being first credit installment on purchase price of plantation; on $1,723 from January 25, 1901, proceeds of sale of that date; on $774.25 from April 25, 1901, proceeds of sale of that date; on $3,083.50 from December 1, 1901, being amount of notes and accounts collected by said executor. * * * The 20 per cent. interest upon the last above mentioned sum being due by said Frank Dimmick to said estate as a penalty for his failure to deposit said sums of money, as soon as same came into his hands, in one of the chartered banks of this state, or in one of their branches, allowing interest on deposits, and for failure of the said executor to keep a bankbook in his official name, and for having paid out to various persons said moneys without an order of court, and for his own personal use and benefit.

"And opponent further represents that even should it be made to appear that said Frank Dimmick did actually deposit the funds of the estate, or a portion thereof, in some bank, yet he withdrew the same without any order of court, and for his own personal use and benefit.

"Opponent further shows that said Frank Dimmick between the 13th February and May 3, 1901, having in possession the said funds as executor, used over $8,000 of the same in purchasing for his own account the interest of several of his coheirs in the estate, at a speculative figure, instead of filing an account and distributing said moneys to said heirs to whom it belonged."

The law here invoked is sections 2 and 4 of Act 13 of 1837, re-enacted in 1855 (Act No. 90, p. 78), and now embodied in sections 9 and 1465 of the Revised Statutes, and articles 1150 and 1151 of the Civil Code. The act as embodied in the Revised Statutes and the Code reads as follows:

Section 9 (identical with section 1465): "They [executors, administrators, etc.] shall at least once in every twelve months, render

to the court from which they received their appointment a full, fair and perfect account of their administration, and on failure so to do, shall be dismissed from office, and pay ten per cent. per annum interest on all sums for which they may be responsible, from the date of the expiration of the twelve months aforesaid."

Article 1150, Civ. Code: "All executors, administrators, curators and syndics shall deposit all moneys collected by them, as soon as the same shall come into their hands, in one of the chartered banks of this state, or in one of their branches, allowing interest on deposits, if there be one in the parish. They shall keep a bank book in their official name, and shall on no account withdraw deposits, or any part thereof until a tableau of distribution shall be homologated, or unless ordered by a competent court, and then only to pay such debts as may be ordered for payment. On failure to comply with the provisions of this section, they shall be condemned jointly and severally with their securities to pay to the use of the estate twenty per cent. per annum on the amount not deposited or withdrawn without authority, besides all special damage suffered, and shall be dismissed from office."

Article 1151: "Any creditor or other person interested may at the regular sittings of the courts in New Orleans and in the country, as well during the vacation as the sitting of the court having jurisdiction, file in the court of the judge having jurisdiction a motion to know whether any executor, administrator, curator or syndic has any funds, and he shall be bound within ten days to file a true statement of his account and his bank book, if he has one, showing the amount of funds collected by him, and on failure so to do, shall be dismissed from office and pay ten per cent. per annum interest on any sums for which he may be responsible."

The facts pertinent to this ground of opposition are as follows: Levisa Carpenter Dimmick died in October, 1899, and Addison Dimmick on the 10th of December, 1899. They left no debts, and left as their heirs their children and grandchildren. The children were (1) the accountant, named testamentary executor; (2) Malvern Dimmick; (3) Mrs. Price; (4) Mrs. McDowell. The grandchildren were (1) the minor Frank Pulford,

issue of the marriage of the opponent with Stella Dimmick, deceased; (2) the minors Effie, Myrtle, Bessie, Ira, and Willie Dimmick, issue of the marriage of Coos Dimmick, deceased; (3) John Addison and Fanny Dimmick, issue of the marriage of J. D. Dimmick, deceased. Four children and the issue of three predeceased children. Mrs. Price and the minors resided in St. Landry parish; Mrs. McDowell, in New Orleans; Malvern Dimmick, in Arizona; and John Addison and Fanny Dimmick, in Nebraska. All the property was community. The husband alone left a will. This will was probated on the 20th of December, 10 days after the death of the testator. It appointed Frank Dimmick executor, without bond, and gave him one-fourth of the estate—the entire portion within the disposing power of the testator. The executor qualified on the same day, December 20, 1899.

The inventory of the estate was made promptly, and was filed in court on the 27th of December. The property of the estate consisted of the following: Three-fourths, undivided, of the Bellevue Plantation, and of the proceeds of the crop made on it in 1899; some lands of no great value; and some movable property and notes; the whole estimated at $19,282.65.

The minors Effie, Myrtle, Bessie, Ira, and Willie Dimmick being without a tutor, it became necessary to appoint one; and Frank Dimmick, the executor, was appointed dative tutor, and qualified as such on the 27th of December—the day itself on which the inventory was filed.

A few days thereafter, on the 2d of January, the executor made a division of the proceeds of the crop of 1899 among the heirs. These proceeds amounted to $4,502.15. He deducted therefrom the $479.75 which he now claims was due him for his expenses in making the crop; next, he deducted one-fourth, as belonging to him as part owner of the plantation; then he deducted $1,200, the estimated legal expenses for settling the succession; and finally he divided the remainder among the heirs, giving $190 to each. This $190 the opponent received and gave receipt for.

A few days after this partition, on the 16th of January, 1900, the heirs entered into an agreement by which the sale of the Bellevue

Plantation was to be postponed for one year, and the plantation was during that time to be cultivated by the executor for the benefit of the estate, he to receive for his services as manager $600.

Six days after this agreement, on the 22d of January, Frank Dimmick qualified as administrator of the succession of Levisa Carpenter.

On the 8th of February, 1900, the movables, except those necessary for operating the Bellevue Plantation, were sold, on the petition of the executor and with the consent of the heirs, and realized $2,222.45.

This money the executor, between the 19th of February and the 2d of March, distributed to the heirs. But he did not let the opponent know that he was making the distribution, and the opponent did not get the share coming to his ward. Both this distribution and that of the proceeds of the crop of 1899 were made extrajudicially. Asked why he did not give the opponent the share coming to his ward, the executor answered that the opponent did not call for it. The opponent testifies that he did not know that a distribution was being made, and only heard of it some time afterwards, and then only incidentally, in conversation with one of the heirs. In point of fact, the only money received by the opponent to this day is the $190 of the proceeds of the crop of 1899.

On the 12th of April, 1900, the opponent filed the suit, already referred to, to set aside the transfer made by the deceased to Frank Dimmick in February, 1898, of a one-fourth interest in the Bellevue Plantation. The suit was also for a partition of the plantation by licitation. On this latter demand, no defense being made, the court on the 12th of October, 1900, rendered a separate judgment decreeing the partition, and fixing the terms of the sale. These were, one-third cash, and the balance payable in one, two, and three years, to be represented by interest-bearing notes of denominations corresponding with the amounts coming to each heir out of the price.

The plantation, without the immovables by destination thereon, was sold on the 28th of November, 1900, for $17,050, the adjudicatee being the executor himself. Possession was not to be delivered before the 1st of January following. The auctioneer's procès verbal of the sale recites that the price, consisting of notes and cash, was delivered to the executor.

No further steps were taken in the succession proceedings until January 25, 1901, when the immovables by destination on the plantation were sold. They brought $1,723.60, and this price was paid over in cash on the same day to the executor. The lands, notes, etc., were sold on the 25th of April, 1901, and the price, $774.25, was paid on the same day in cash to the executor.

On the 13th of February, 1901, the executor bought the rights of Mrs. McDowell and Mrs. Price in the succession. On the 27th of March he bought those of John Addison Dimmick and Fanny Dimmick, residents of Nebraska. On the 3d of May he bought those of Malvern Dimmick, a resident of Arizona. In not one of the four acts of sale was any price stated, but only that the sale was made for valuable consideration. Questioned on the witness stand as to why this was done, and as to what was the real price, the executor states what the price of each sale was, and says that his attorney, and not he, is responsible for its not having been stated in the act; that after one act had been passed he suggested that the price be stated, but that the attorney and the notary said: "No; leave it as it is. It makes no difference." The price of these sales was computed or fixed on the basis of the executor's being owner of one-fourth of the plantation, and of his being entitled to the credit of $479, and also on the basis of the deduction of $1,200 made from the proceeds of the crop of 1899 for the expenses of settling the estate having been properly made. Comparing the prices of the sales with the amounts the heirs would have received had they not sold their rights, the price of the sale by Mrs. McDowell was $130.74 more; that of the sale by Mrs. Price, $119.26 less; that of the sale by Malvern Dimmick, $699.26 less; and that of the sale by Addison and Fanny Dimmick, $719.26 less. After these sales the executor's interest in the succession was as follows: As legatee, one-sixth of the whole; as heir and as purchaser of the rights of his coheirs, five-sevenths of five-sixths of the whole. In other words, the total estate being $26,201.78, his share was $19,963.26.

The suit to annul the transfer of the un-

divided fourth of the plantation was finally decided in the Supreme Court on the 31st of March, 1902. It resulted in a judgment annulling, the transfer, and allowing Frank Dimmick, the executor, $3,900 for the services in payment of which the transfer had been made. The account to which opposition is now made was filed on the 10th of June, 1902, two months and ten days after the decision of the suit. The account, however, had been made out and submitted to the attorney of the opponent three weeks previously.

So much' for the chronological history of the settlement of the succession.

The main facts on which the opposition rests are those in connection with the conduct of the executor in withdrawing from bank those of the funds of the estate which he had deposited, and in failing to deposit others. These facts we intentionally abstained from giving as we went along, in order that they might be given together and in greater detail.

Of the proceeds of the crop of 1899, amounting to $4,502.15, the executor deposited in bank $3,952.50. This deposit he made on the 20th of December, the day on which he qualified. Of the proceeds of the first sale of movables, that of the 8th of February, 1900, amounting to $2,222.45, he deposited, on the 9th of February, $500, and on the 13th of February, $828.25, or a total of $1,328.25. Beyond this, the executor never deposited one cent in bank to the credit of the estate, or to his own credit as executor. On the 13th of November, 1900, he received in cash one-third of the price of the Bellevue Plantation, or $5,650; and later, presumably one year later, he received another third, or $5,650. On the 25th of January, 1901, he received $1,723, proceeds of sale of movables; and on the 25th of April, 1901, he received $774.25, proceeds of sale of lands, etc. In addition to this, he collected, at dates not given, moneys due the estate to the amount of $3,-083.50.

By August 8, 1900, he had drawn out all of the $5,280.75 deposited, except $719.75, and this last amount he drew out on the 13th of February, 1901. The withdrawals were as follows: December 20th, $100.93; December 26th, $15; January 2, 1900, $1,235; January 5th, $176.74; January 17th, $22;

February 1st, $77; February 13th, $1,000; February 16th, $36.25; February 19th, $115; February 27th, $42.28; March 1st, $190; March 2d, $190; March 8th, $190; March 14th, $100; April 14th, $71; July 9th, $500; August 28th, $500; February 13, 1901, $719.55.

The executor does not pretend to have had any order of court for these withdrawals. On cross-examination he testifies that the $1,235 was withdrawn for the purpose of partitioning the proceeds of the crop of 1899 among the heirs; the $77 to pay for a tomb; the $1,000 to pay himself his one-fourth interest in the crop of 1899. That he cannot recollect for what purposes the $500 and the $719.55 were withdrawn.

The executor does not give any explanation of why he did not deposit the money of the estate in bank, except that he says he did not think or know that it was necessary to do so, as he was owner of five-sixths of the estate. But we find that he did not acquire the rights of Mrs. McDowell and of Mrs. Price until the 13th of February, 1901, and the rights of John Addison and Fanny Dimmick and of Malvern Dimmick until the 27th of March and 3d of May, 1901, respectively. He received the funds of the estate in cash as follows:

| | | |
|---|---|---|
| Dec. 20, 1899. | Proceeds of sale of crop of 1899...... | $4,502 15 |
| Feb. 8, 1900. | Proceeds of sale of movables ......... | 2,222 45 |
| Nov. 28, 1900. | Cash portion of price of plantation ..... | 5,683 33 |
| Jan. 25, 1901. | Proceeds of sale of movables ......... | 1,723 00 |
| April 25, 1901. | Proceeds of sale of lands, etc. .......' | 774 25 |
| Nov. 28, 1901. | (Presumably) first installment of credit portion of price of plantation ........ | 5,683 33 |

He had therefore received and failed to deposit large sums of money of the succession before the sales by his coheirs to him had been made. He explains, however, that as far back as December, 1899, an agreement had been entered into with the absent heirs by which they were to sell him their rights at a price to be fixed thereafter on the basis of the sale of the plantation, and on an estimation to be made of the other property of the estate.

It has been noted that in the opposition the charge is expressly made that the executor

used the funds of the estate to purchase the rights of his coheirs at a speculative figure. The executor does not deny that he used the funds of the estate to make the purchases, but he says that the funds were his own, because the heirs to whom he paid the money had agreed to sell out to him, and knew what money he was paying them with. The accusation that he took advantage of his position as executor to drive an unequal bargain with his coheirs, especially the absentees, he meets by no testimony except his own. The concealment of the price he accounts for by laying the blame at the door of his attorney.

Such are the facts. It may well be that everything was as the executor says, and, since the learned judge a quo has accepted that version of the matter, we will do the same, especially as the heirs whose rights he bought, who are the only possible sufferers from his act, are not before the court complaining; but the naked facts remain that the executor of this debt-free succession rendered no account until June, 1902, two full years and six months after his qualifying; that he deposited none of the money of the succession in bank, except $5,280.75; and that this small deposit he soon withdrew without any order of court, and without any tableau having been homologated.

On these facts the act of 1837 pronounces judgment in no uncertain or ambiguous terms.

The judge a quo overruled this ground of opposition nevertheless. He held that the imposition of the penalties of this act of 1837 was discretionary with the court, and that, in his opinion, the case was not a proper one for the exercise of the severity of the statute; a full account having been rendered, and the succession having suffered no loss. Individually he was of opinion that the statute is imperative, and leaves no discretion to the court, but he felt bound to follow the decisions of this court in the cases of Succession of Boutte, 32 La. Ann. 557; Congregation v. Farrelly, 34 La. Ann. 533; and Succession of Barrett, 43 La. Ann. 61, 8 South. 438.

In this appreciation of the facts of the case we can agree with our learned Brother only in part. Granting that the executor is excusable for not depositing that part of the proceeds of the crop of 1899 and of the sale of February 8, 1900, destined eventually to come to himself as heir and legatee and as tutor, and that, also, he is excusable for having withdrawn the proceeds of the sale, at the instance or with the consent of the heirs, to make an extrajudicial partition, the portion of the funds covered by this excuse amounts to only $190 to each heir, or $1,330, and $750.35 to himself as legatee, or a total of $2,080.35, or even adding his one-fourth as part owner of the plantation, to $3,455.88, whereas the fund in question amounted to $4,502.15. And so likewise as to the proceeds of the sale of February 8, 1900. He withdrew from deposit the share of the opponent's ward, and never paid it over to opponent. These facts speak for themselves, and condemn the executor beyond the discretion of the court, unless, indeed, the discretion is to be one entirely uninfluenced by the act of 1837. And so, also, as to the share of the Pulford minor in the proceeds of the sale of the plantation and of the other property of the estate. Furthermore, under his own testimony, it was not until several months after the sale of the plantation that he agreed upon a price, and consummated a sale of the rights of the heirs whom he bought out. He should in the meantime have deposited the funds, and did not.

The balance to the credit of the estate in bank, $719.55, was drawn out on the same day on which the acts of sale with Mesdames McDowell and Price were passed. Questioned on the witness stand as to whether he did not draw out these funds of the estate for the purpose of using same towards making payment under these sales, he answers, he cannot say; he does not recollect. Again, he cannot say for what purpose he withdrew the $500 of July 9th, and the $500 of August 28th—whether it was not for his own private purpose.

The plea of the executor that he could not file an account so long as the suit to set aside the transfer of the fourth interest in the plantation to himself remained undecided cannot avail. If such excuses could avail, they would not be wanting in every case, and the law imperatively requiring an account to be filed would remain a mere dead letter. What the law requires to be filed is an account, not a final account. The executor might have filed a provisional account.

The learned counsel for the opponent con-

tends that the act of 1837 is imperative and leaves no discretion to the court, and that, therefore, whenever one of the cases provided for by the act is presented, the penalties of the statute must be imposed, and that the present case comes squarely within the statute. This, we feel compelled to say, appears to us to be the only view that can be taken, if the act of 1837 is not to be ignored entirely.

The language of the act is unconditional, unambiguous, explicit, and imperative: "Executors shall render an account at least once in every twelve months, and on failure to do so shall be dismissed from office and pay ten per cent.," etc. "Shall deposit all moneys collected by them as soon as same shall come into their hands, and shall on no account withdraw the deposits, or any part thereof, until a tableau of distribution shall be homologated, or unless ordered by a competent court, and then only to pay such debts as may be ordered for payment. On failure to comply with these provisions, they shall be condemned," etc.

The act is not remedial, but penal, in nature. Shortly after its enactment it was declared in the Succession of Peytavin, 7 Rob. 479, to be a "highly penal statute." For certain acts it denounces certain penalties, in positive, imperative terms. How it can be said that the enforcement of it is discretionary, we must say we do not understand. It is as binding on the courts as upon executors and administrators.

But that, as stated by the judge a quo, this court has, in at least two decisions, held the enforcement of the act to be discretionary, there can be no questioning. In the case of Congregation v. Farrelly, 34 La. Ann. 533, the executor had failed to file an account within the year as required by the statute, but had filed one after suit had been brought against him for his removal, and for the penalties denounced by the statute. The court excused him on the ground that the account filed by him was full and complete, and that "it is well settled that the enforcement of the penalties provided for this and similar defaults of executors and administrators is matter within the sound discretion of the court." In Succession of Barrett, 43 La. Ann. 63, 8 South. 438, the administrator had failed to deposit the funds of the suc-

cession, and the court excused him on the ground that he had not made an improper use of the funds; that the debts paid with the money were due by the succession; and the court added that it would not "interfere with the discretion vested in the judge in the enforcement of these penalties." Citing the Farrelly Case.

The other cases in our Reports bearing upon the point are the following:

In Succession of Head, 28 La. Ann. 800, the court held squarely that failure to file an account within the year is not cause for the removal of an administrator, provided that, when called upon to file an account, he does so.

In Succession of Boutte, 32 La. Ann. 556, the court, while declaring that the failure to deposit and the paying out of moneys without order of court are both plainly prohibited by article 1150, Act 1837, and subject the executor to penalties, nevertheless said that against mere technical violations of the statute the executor may plead equity.

In Depas v. Riez, 2 La. Ann. 30, where an administrator had failed to deposit the funds of the succession in bank, and where, so far as the report of the case shows, there was no question of misuse or loss of the funds, the court disposed of the matter in a very few words, as follows: "There is no error in the judgment dismissing the executrix from office. The third section of the act of 1837 is imperative, and it is not pretended that she has complied with its requisitions."

In Succession of Christy, 6 La. Ann. 427, the executor was dismissed merely for having failed to deposit the funds of the succession. No proof was administered of any loss to the succession, or of misuse of the funds. The court said:

"The object of the law was to prevent the eagerness and litigiousness with which those trusts were sought; another to insure prompt settlements with heirs and creditors, which were protracted by interminable litigation, while the fiduciary had the temptation of using the money as his own. The law has had a most salutary effect in these respects, and commands the favor rather than the reluctant aid of the court in carrying it into effect."

In Succession of Caballero, 25 La. Ann. 646, it was not shown that the failure to deposit the funds had resulted in loss to the succession, nor was any proof administered of what use the executor had made of the funds. The court enforced the penalties of the statute, contenting itself with saying: "This sum the executor should pay over to the opponents, with twenty per cent. per annum interest, because he failed to keep the same deposited in a chartered bank of this state according to law." Citing Rev. St. § 7.

In Reed v. Crocker, 12 La. Ann. 445, where, again, so far as appears from the report of the case, the succession had suffered no loss, and there had been no misuse of the funds, the executor was dismissed and the penalties imposed, because the funds had not been deposited and an account had not been filed within the year. The court said: "The court below has held the defendant liable to the penalty imposed by the act of March 13, 1837 (section 3), re-enacted on the 12th March, 1855, for such sums as the executor withdrew from the bank without an order of court, and we find no error in that ruling. The cases are numerous in which the penalty has been enforced. Indeed, the law is imperative. Cases might possibly arise whose peculiar circumstances would form an exception—as, for instance, if the administrator held the power of attorney from the very heirs who claimed to make him liable for the penalty of the statute in question. The requirement of both these statutes is no less imperative that the executor must render a full account of his administration at least once in every twelve months."

In Pearle v. White, 7 La. Ann. 450, the court refused to remove an administrator who had failed to deposit the money of the succession; but, as we gather from the record, the succession was large, and the money was "inconsiderable—not more than necessary to pay expenses." Perhaps the court considered the case came within the maxim, "De minimis non curat lex."

In Dickson v. Dickson, 23 La. Ann. 583, the court refused to impose the penalties of the statute upon an administrator where proceeds of a crop belonging to the succession had been lost by the bankruptcy of the commission merchant in whose hands they had

111 LA.—22

been suffered to remain. But as we understand the decision, it is pitched on the fact that the heirs impliedly consented to the fund being left in the hands of the commission merchant.

In Succession of Sparrow, 39 La. Ann. 704, 2 South. 501, the reliance was not on the act of 1837, and nothing shows that the court had the act of 1837 in mind, but the court there said: "It is well settled that the enforcement of the penalties provided for this and similar defaults of executors and administrators is a matter within the sound discretion of the court." Citing Congregation v. Farrelly, from which this dictum is quoted verbatim, and Dickson v. Dickson, decided, as we have just said, upon the consent of the heirs, not upon the interpretation of the act of 1837.

In Ford v. Kittredge, 26 La. Ann. 194, the court said: "She has not filed an account of her administration within a twelvemonth. The law makes this her duty, for the nonperformance of which the penalty is dismissal from office. Rev. St. § 9."

In Gray v. Waddell, 33 La. Ann. 1021, the court said:

"It is contended that a judgment of removal upon failure to file an account is not authorized, unless there is first an order to render an account, and refusal to obey such order; and reference is made to section 3696, Rev. St., as sustaining this proposition. And it is argued that inasmuch as the administrator, in this instance, did render his account, when ordered to do so, the judgment was without law or reason to support it. The section of the Revised Statutes referred to as supporting this view contains merely the provision that a curator of a succession may take a rule on an executor or administrator to show whether he has any funds in his hands for the payment of the debts, and, on his failure to file the proper statement in ten days, he may be dismissed. The section which follows the one referred to (3697), however, requires that such fiduciaries shall, 'at least once in every twelve months, render an account of their administration, and, on failure so to do, shall be dismissed from office and pay ten per cent. per annum on all sums for which they may be responsible, from the date of the expiration of the twelve months

aforesaid,' and the terms of this requirement are mandatory, and show that the duty is to be performed under the penalty prescribed, without an order to compel the discharge of such duty."

In Succession of Benton, 106 La. 503, 31 South. 123, 59 L. R. A. 135, the above cases were referred to, but not by way of criticism and examination in the light of the express provisions of the act of 1837.

In this review of the decisions of this court bearing upon the interpretation of Act 13 of 1837, we have not noted the cases, like that of Succession of Willis, 109 La. 281, 33 South. 314, where this court has refused to remove an administrator or executor for the reason that the succession was wound up, and the removal of the officer would have no other effect than to. occasion further expense. To enforce the statute in such a case would be to cause it to mulct in useless costs the very parties in whose behalf it was passed. The statute would be wounding the very objects of its protection; indeed, turning its sword against its own breast. Such delinquent administrators and executors may be made to pay the penalties denounced by the statute, where the parties in interest demand it; but to remove them from office, to no one's good, and to the great harm of the succession, would be to follow blindly the letter of the statute, while ignoring its spirit. Other cases may be easily imagined, coming within the letter, but manifestly not within the intendment, of the statute—as, for instance, where the filing of an account has been delayed for a short while beyond the 12 months because of the serious illness of the officer or of the attorney who was to prepare the account; but this does not affect the rule that the penalties must be imposed whenever the statute has been violated, whether thereby the succession has suffered loss or not.

Also the statute may be rendered inoperative by the consent of the parties in interest, heirs or creditors. It having been enacted in their interest, they certainly can waive its benefit and dispense with its observance, as is said by the court in the case of Reed v. Crocker, 12 La. Ann. 445. For instance, in the instant case no penalty could be decreed in connection with that part of the proceeds of the crop of 1899 that was extrajudicially partitioned among the heirs, nor in connection with that part of the funds coming to the executor himself, nor in connection with that part coming to the heirs who have sold him their rights, nor in connection with that part coming to the minors under his tutelage, whose funds he had control of. As to all these amounts, the right to an account and the right to have the funds deposited must be considered to have been waived. But the opponent has made no such waiver, and, since he is demanding the enforcement of the statute, the court is bound, we think, to give judgment accordingly.

We do not think, however, that double interest can run against the executor; that is, 10 per cent. for nonfiling of account, and 20 per cent. for nondepositing or for withdrawing, or 30 per cent. in all, but that only one interest can run.

Furthermore, the 20 per cent. interest being imposed by way of penalty for not depositing funds received by the executor for the succession, it can be computed only on funds actually received; and, while sums due by the executor individually to himself officially are by law presumed to have been paid, yet, nothing showing that the amount of the first installment of the credit portion of the price of the plantation was ever in actual cash in the hands of the executor before the date of the filing of his account, when he acknowledged to have the amount on hand, the 20 per cent. per annum interest can be computed on this amount only from the date of the filing of the account. The executor is given the benefit of the assumption that the debt was not paid, but, since it is thus held not to have been paid at the maturity of the note, interest must be held to have run on it as it would have run had the debt been due by a third person, and had not been paid.

The share of the opponent's ward is $5/_{42}$ of the whole. On this proportion of the funds of the estate the executor and administrator must be condemned to pay. 20 per cent. per annum interest, beginning from the dates and for the amounts as prayed in the second paragraph of the present ground of opposition, as found in the petition, except, however, as to the $3,083.50, the date of the reception whereof is not proved, and for the purpose of proving the date or dates

of the reception of which this case must be remanded, and except also,· as to the amount of the first installment of the credit portion of the price of the plantation, due by the executor individually to himself officially, and not shown to have been actually received by him in cash previous to the date of the filing of his account.

Since the interest thus decreed to be paid has accrued exclusively on the share of the opponent's ward, it belongs exclusively to opponent's ward. It follows its principal.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside in so far as it rejects the demand for the penalty of 20 per cent. per annum interest against the accountant, and that in all other respects it be affirmed. And it is further ordered, adjudged, and decreed that Frank Dimmick, testamentary executor of the succession of Addison Dimmick, and administrator of the succession of Levisa Carpenter, be condemned to pay to the said succession 20 per cent. per annum interest on $5/42$ of the following amounts, and from the following dates, to. wit: $1,005.60 from December 15, 1899; $2,222.45 from February 8, 1900; $5,683.43 from November 28, 1900; $5,683.33 from June 10, 1902; $1,723 from January 25, 1901; $774.25 from April 25, 1901; $3,083.50 from a date or dates to be fixed hereafter on further trial of this case; and it is ordered that for the purpose of fixing the said date or dates this case be remanded.

It is further ordered, adjudged, and decreed that the said executor and administrator be condemned to pay to the said successions under his administration 8 per cent. per annum interest on $5/42$ of $5,683.33 from the 28th of November, 1901, to the 10th of June, 1901.

And ·it is further ordered, adjudged, and decreed that, in the distribution of the funds of the said successions, the said 20 and 8 per cent. interest be attributed exclusively to the share of the minor Frank Pulford.

It is further ordered, adjudged, and decreed that the costs of this opposition and of this appeal be paid by the accountant, Frank Dimmick.

BREAUX, J., concurs in the decree.

## On Application for Rehearing.

### (Feb. 1, 1904.)

PER CURIAM. The statute provides that for failure to file an account every 12 months, or for failure to deposit the moneys of the succession in one of the chartered banks of the state, or for withdrawing the funds of the succession from bank without an order of court, the executor shall pay 'a certain interest per annum on the funds involved. Against the enforcement of this statute the executor pleaded the prescription of one year applicable to debts arising ex delicto.

It appeared to the court so obvious that prescription did not apply to this running interest, that the plea was passed over in silence, whereby, in effect, it was overruled.

The executor complains, on application for a rehearing, that the court should have passed on the plea. In a sense, the complaint is well founded. The plea was expressly made, and should have been passed upon.

It was overruled for the reasons, among others, that a statute which provides for running interest at a certain per cent. a year, by its very terms, excludes the idea that the right to recover the interest so provided for can be prescribed by one year, and that prescription cannot run in favor of the executor against the succession he represents.

Rehearing refused.